720 F.2d 1059
 14 Fed. R. Evid. Serv. 1592
 UNITED STATES of America, Plaintiff-Appellee,
v.
Irving BROWN, Ronald Louis Crawford, Allen Lewis
Crutchfield, Freddie Harris, Sherman Edward
Jackson, Bobby Joe Moore, Conway Waddy,
Diana Wallace, Kerry Woods,
Defendants and Appellants.
 Nos. 80-1175 to 80-1180 and 80-1199 to 80-1201.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 13, 1981.
Reassigned and Resubmitted July 27, 1982.
Decided Nov. 18, 1983.
As Amended April 10, 1984.
 
 Jack C. Wong, Asst. U.S. Atty., Portland, Or., for plaintiff-appellee.
 Jack Ransom, Ransom, Rogers & Blackman, Portland, Or., for Brown.
 Frank Noonan, Winfree & Noonan, Portland, Or., for Crawford.
 Paul J. DeMuniz, Garrett, Seideman, Hemann, Robertson & DeMuniz, P.C., Salem, Or., for Crutchfield.
 John M. Burgess, Salem, Or., for Harris.
 Phillip M. Margolin, Portland, Or., for Jackson.
 Diane E. White, Tigard, Or., for Moore.
 Stephen Gilbert, Los Angeles, Cal., for Waddy.
 Edward Jones, Oregon City, Or., for Wallace.
 Levi Smith, Portland, Or., for Woods.
 Appeal from the United States District Court for the District of oregon.
 Before BROWNING, Chief Judge, POOLE and REINHARDT, Circuit Judges.
 POOLE, Circuit Judge:
 
 
 1
 The defendants appeal the judgments and sentences entered and pronounced against them upon verdicts of a jury after trial in the district court on an indictment charging them with conspiracy to distribute a controlled substance (heroin) in violation of 21 U.S.C. Secs. 812, 841(a)(1), and 846, and various related substantive offenses.
 
 
 2
 In general, the Government's case charged the existence of an ongoing conspiracy set in motion by the principal defendants for the distribution of narcotics in the Portland, Oregon area utilizing the assistance and cooperation of numerous lesser persons as agents and couriers. Some of the latter were named co-conspirators and charged with specific substantive overt offenses. As set forth later, the cases of certain defendants were severed and they either pleaded guilty to specified counts or turned witness for the prosecution in exchange for reduced charges and punishment.
 
 
 3
 The indictment originally named 20 persons as defendants and contained 21 counts. The major charge, Count I, alleged a conspiracy involving all 20 defendants. It contained 41 overt acts which tracked the outlines of the conspiratorial activity and of the 20 additional substantive counts. A summary of the charges appears in Appendix A, post.
 
 
 4
 Prior to trial, on the Government's motion, defendants Phillip Tyrone Stephens and Johnny R. Williams, Jr., were ordered severed. They testified as principal government witnesses and their testimony formed the most substantial foundation of the prosecution case. Three others, Daniel Harvey, Rothey Alvin Manus, and Aaron G. Mosley, entered negotiated guilty pleas before trial. A fourth, Jerome H. Woods, pleaded guilty after the first day to conspiracy and to four substantive charges (two of travel in interstate commerce for "racketeering" purposes, to distribute the proceeds of unlawful activity, and two of use of a telephone to facilitate distribution of a controlled substance). At the conclusion of the prosecution case in chief, the court granted severances to defendants Larry Earl Crawford, Norman J. Moore, and Barry A. Wallace and their cases were dismissed after the trial. The court also ordered acquittal of Paul Dedric Jones of conspiracy (his only charge), and acquittal of Allen Louis Crutchfield as to one of several substantive charges against him.
 
 
 5
 Ten defendants remained. After a protracted jury trial, nine persons--the appellants on this appeal--were each convicted of the major conspiracy count and individually of various other charges. Appellants are: Irving Brown, Ronald Lewis Crawford, Diana Wallace, Kerry Woods, Allen Louis Crutchfield, Sherman Edward Jackson, Bobby Joe Moore, Freddie Lee Harris, and Conway D. Waddy. The jury could not agree on a verdict as to Roy Ray Washington who was charged only with conspiracy, and it disagreed on Count VI (distribution of heroin) as to Sherman Edward Jackson. Mistrials were granted as to those counts and they were ultimately dismissed.
 
 
 6
 Each appellant, except Diana Wallace, was sentenced to prison for terms ranging from three to twenty-two years.[1] Wallace's sentence was suspended and she was placed on five years probation. In addition to the prison sentences, there was imposed upon each defendant so sentenced, a special parole term of varying length. Crawford's imposed special parole term was set aside before appeal. Under Bifulco v. United States, 447 U.S. 381, 100 S.Ct. 2247, 65 L.Ed.2d 204 (1980), it was error to impose special parole terms upon the conspiracy convictions and they are invalid.
 
 
 7
 Appellants have raised numerous claims of error, challenging the overall conduct of the trial. We dispose of most with short comment since we find them without merit or that none constituted reversible error. Particularly, we find that, apart from the errors discussed below, the evidence was sufficient to support the verdicts. We do however hold that two major specifications of prejudicial error are substantial.
 
 
 8
 First, we are convinced that it was error for the court to permit the prosecution to introduce the testimony of Police Sergeant John McNabb. That testimony consisted entirely of the presentation of a highly volatile and inflammatory description of statements elicited from appellant Sherman Edward Jackson during an unrelated street confrontation between the policeman and the appellant while the latter was under arrest in connection with an alleged traffic incident. We conclude that this testimony was inadmissible under Miranda v. Arizona, 384 U.S. 436, 437, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and other authorities; that its prejudicial impact outweighed its probative value; and that its admission by the trial court was an abuse of discretion under Rule 403 of the Federal Rules of Evidence.
 
 
 9
 This evidence, together with other evidence regarding the flamboyant lifestyles of the band of alleged co-conspirators, presented a serious potential for prejudice. We find it unnecessary, however, to decide whether its consequential impact was alone sufficient to require reversal, because it did not stand alone. The court also erroneously admitted into evidence the full texts of plea bargain agreements which the Government struck with three key prosecution witnesses. Each agreement featured provisions by which the witness agreed to tell the truth and testify truthfully and to have their continuing veracity confirmed by polygraph or "lie detector" tests at the Government's option. The impropriety of this evidence was compounded by the prosecution's final arguments which skillfully tied the strands of witness credibility to the bonds of the plea bargain contract, the essence of which was that continuous monitoring of the witnesses' reliability was available to the Government by means of the polygraph. We conclude that the result was impermissible witness "vouching" which substantially prejudiced the rights of all appellants to fair trial. Accordingly, we reverse the judgments and set aside the convictions.
 
 I.
 The McNabb Testimony[2]
 
 10
 The prosecution called Police Sergeant John McNabb as a witness. He presented no substantive evidence as to any allegation of the indictment. His sole function was to repeat to the jury statements of appellant Jackson, made during his detention for a possible "hit-run" vehicular violation, in which Jackson allegedly confessed to having "some dope," in response to the witness' inquiry. The prosecutor carefully elicited that while holding Jackson in custody, the policeman had called him a "pimp and doper;" had accused him of "sell[ing] dope to little black children;" and that in return Jackson had screamed that he "sell[s] dope to honkies and white bitches and whores." The court overruled defense objections that direct or indirect questioning of Jackson was forbidden by the Miranda rule against custodial interrogation; and that the testimony was collateral and excludable in that its manifest prejudice outweighed its limited probative value.
 
 
 11
 A review of the record shows that McNabb and Jackson knew and mutually disliked each other. Early on the morning of March 20, 1978, while driving in his police vehicle, McNabb overheard a radio transmission from a nearby traffic officer, Cotton, that he was stopping a Cadillac on a possible property damage "hit-run." McNabb came to the scene and immediately recognized Jackson as the driver of the car. Another police car arrived with other officers. Officer Cotton conferred with the other police and sent one of them back to attempt to locate a taxicab into which Jackson's car had reportedly "backed," while McNabb maintained custody of Jackson. The disposition of that particular charge was not revealed and the incident itself had no relation to the charges in the indictment under which Jackson and his co-defendants were being tried.
 
 
 12
 Protesting his detention, Jackson demanded to be told why he was accused and being held and pointed to the absence of collision marks on his own vehicle. McNabb testified that Jackson carried on a "verbal tirade." (Jackson later claimed to have been stopped by Portland police more than 50 times and to have had his car searched by them on many occasions. A civil rights suit for damages against Portland Police was settled by payment to Jackson of $5,000.)
 
 
 13
 McNabb testified that he "ordered [Jackson] to wait and not get back in his car," and gave him other orders from which the district court assumed, and the prosecutor conceded, that Jackson was legally in custody and not free to leave.[3] Sarcastically, Jackson asked if there was "anything else" that McNabb wanted. McNabb testified that he replied:
 
 
 14
 At that time, I replied, and I'm quoting, "Oh, I don't know, you got any dope." (Emphasis supplied). He became even more angry and volatile and loud at that time. And he moved a little closer to me, and he yelled at me and he said, "Yes, I have got some dope. You want to buy some." I told him at that time I didn't want to buy any dope, but if he had any I would like to take it away from him. * * *
 
 
 15
 Jackson submitted to a pat-down search and McNabb then ordered him to move out of the traffic lane and onto the sidewalk. A crowd began to gather. McNabb told the jury that Jackson demanded that he "be treated like a man," and that McNabb then said:
 
 
 16
 I told him, so far as I was concerned, he was acting like a typical pi[m]p and doper on the streets, as opposed to a man. (Emphasis added).
 
 
 17
 McNabb recited that Jackson had boasted of his wealth, that he had cash in his pocket, and that he could make bail if jailed on this charge; and described in detail jewelry worn by Jackson. Then, reading further from prepared notes, McNabb testified that he "felt the need to again respond." He told the jury:
 
 
 18
 I made other comments to him, quoting from my report, I said, "You might be right, but you're the one that sells dope to little black children." He screamed back at me and said, "I sell dope to honkies and white bitches and whores." I said, "you also sell dope to little black children." He replied, "So what if I sell it, you white honkies bring it into the country." (Emphasis supplied).
 
 
 19
 That substantially concluded McNabb's testimony. His witness value clearly was limited entirely to the presentation of his and Jackson's statements while Jackson was in police custody. There is no evidence that any of McNabb's accusations were true.
 
 
 20
 The trial court allowed in the entire narration over defense objections.[4] This was error and it was error with direct effect on the right of fair trial. The jury was left free to find in Jackson's responses on the street a confession of prior offenses, of present criminality, and to speculate that it tended to prove the conduct charged in the indictment.
 
 
 21
 The Government had conceded that Jackson was in custody of the police within the rules of Miranda v. Arizona, 384 U.S. 436, 437, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). That authority substantially forbids police to subject their prisoners to interrogation without at least a warning that they have the right to remain silent and to have counsel before committing themselves. Nonetheless, the entire inflammatory colloquy went into evidence and the jury left free to believe the policeman's accusations were true, although the jury had no evidence thereof. The only advice given to the jury by the trial judge as McNabb left the witness stand was:
 
 
 22
 Members of the jury, the testimony you have heard is subject to same limited instruction previously given, you may consider it for such weight and value and effect, if any, as you think it should have, only as with respect to Mr. Jackson and not against any other defendant in this case.
 
 
 23
 Furthermore, I instruct you with respect to any matter relatively [sic] to any charge of hit and run, of course, Mr. Jackson is not on trial here on any such charge. He is only on trial here on the charges in this indictment; and, the subject comes up only by virtue of the recital of the conversation itself. And your sole function here is to decide whether he is guilty or not guilty of the charges here and not of some other charges that may at some time have been put against him.
 
 
 24
 (RT 890). While the jury was aptly told to draw no adverse inferences against the defendant because of his possible involvement in a misdemeanor hit and run, they were, in contrast left quite free to believe that Jackson was a pimp and that he sold dope to little black children, and even that he might "have sometime been" so charged, all of which was completely not of record. The court simply dismissed all objections, held that Miranda did not apply, that there was no "custodial interrogation," and that all was volunteered by Jackson. The court did not address the aspect of prejudice, and allowed the jury to consider all the evidence for what ever it might be worth. We hold that this was error.
 
 
 25
 In concluding that there was "custody" but no "interrogation,"[5] the trial judge reasoned that there had been no interrogation in fact because McNabb's "questions" were not "formal" police questioning. To the contrary, as the McNabb transcript in the appendix shows, McNabb very much orchestrated the dialogue. The judge referred to the incident as an "exchange," and ruled that McNabb's words were not calculated to provoke replies. He said:
 
 
 26
 The exchange did not become an interrogation simply because the sources of McNabb's eventual response took the grammatical form of question. Just as one may probe without questions, not every question which, under the rules of grammar, or punctuation end with a questionmark has the design or likely effect of [eliciting] an answer. * * *
 
 
 27
 This analysis seems to be that although McNabb's words took the form of questions, they were not questions. We find this distinction to be without a difference. The plain import of the policeman's own statements do not support the court's analysis. The court said:
 
 
 28
 Officer McNabb, though he did begin by asking a proper question did not otherwise initiate the conversation or direct its course.
 
 
 29
 (RT 527-529)[6]
 
 
 30
 But McNabb never testified that his "questions" and words were not intended to elicit replies. The trial court stated that
 
 
 31
 "McNabb's subsequent remarks, made in the heat of conversation, cannot reasonably be considered interrogation." (RT 528)
 
 
 32
 The court also said, in ruling on the motion to exclude McNabb's testimony:
 
 
 33
 * * * I think that McNabb intended his remarks to have an effect on Jackson, but not to [elicit] information. (RT 529)
 
 
 34
 The court discounted the appearance of inconsistency because it thought Jackson could not reasonably have believed that the remarks "sought or required a response."
 
 
 35
 The reasoning of the court would place on the prisoner the onus and risk of gauging the mood and seriousness of his custodian's intentions, and presupposes the presence of that very freedom of choice and action the lack of which is the essence of custody, and the empirical recognition of which lack brought about the exclusionary rules in the first place. This is the significance of Miranda. The district judge, however, saw no relevance of that decision here because, as he put it, "custodial interrogation" is barred only when there is overt physical and mental coercion, "in a police dominated setting," or some "effort of police [affirmatively] to deceive the suspect." He found neither condition existed.
 
 
 36
 Defense counsel argued that by McNabb's own admission he expected Jackson to answer his first question, and anticipated further responses to his subsequent jibes. In either case, counsel contended, Miranda's proscription is against police unwarned interrogation of those in custody whether that response is anticipated to be inculpation or exculpation. Either result is capable of being used adversely to the declarant. In Miranda, Chief Justice Warren explicitly pointed out that the privilege lies without distinction between confessions and admissions, and whether the answer obtained be inculpatory or exculpatory.[7] The trial court rejected this argument in finding the evidence admissible.
 
 
 37
 Miranda recognizes the need of those in police keeping to proceed upon reflection before incriminating themselves. That is not because of our unawareness of the reality and pervasiveness of crime, nor from blind adherence to mechanical formulae of procedure. The roots lie deep in historical perceptions that a person should not be moved to incriminate himself except upon understanding and deliberation. Police are not mandated to warn suspects of their rights to silence and to counsel so that criminals can avert justice, but because the requirement accords with our own principles of justice and results from long and empirical chronicling of what may happen to those in custody. Therefore, whether by blunt demand or indirect suggestion, by art or pretense, in whatever manner the police seek to induce response from the prisoner himself, the Miranda right applies and the burden is on the Government to prove that any speech product it wishes to use resulted without its contrivance.
 
 
 38
 The trial court here posited that Jackson's statements were literally not "involuntary" because he did not "have" to make response. But Miranda does not deal with forced incrimination. Police conduct of that nature was forbidden long before that decision. The principle involves implementation of the Fifth Amendment, and requires that police warn a person before tempting him into self-incrimination. A pragmatic way to accomplish that end is to tell him that he may remain silent and is entitled to counsel before he speaks.
 
 
 39
 Shortly after this trial, the Supreme Court decided Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). That case reaffirms the principles of Miranda.
 
 
 40
 Innis was in custody, suspected of murder and robbery committed with a shotgun. The weapon had not been found. Innis, picked up on the street, was being transported to the police station in the back of a vehicle with wire screen mesh separating the front and rear. He had been warned of his Miranda rights. The superior police officer in charge had instructed the transporting police not to question, intimidate or coerce him en route.
 
 
 41
 On the way one officer commented on the missing gun. He said,
 
 
 42
 [That because a school for handicapped children is located nearby,] there's a lot of handicapped children running around in this area, and God forbid one of them might find a weapon with shells and they might hurt themselves.
 
 
 43
 446 U.S. at 294-295, 100 S.Ct. at 1686-1687.
 
 
 44
 Innis (for whom, the opinion states, the remarks were not intended ), overheard the remarks and interrupted. He told them to turn the car around so he could show them where the gun was located. The officers did not comply. Instead they radioed their superior that they were returning to the scene of the arrest and that the prisoner had said he would direct them to the gun. When they arrived at the scene, where a search for the gun was already underway, the superior officer again advised Innis of his Miranda rights. According to the opinion:
 
 
 45
 There, Captain Leyden again advised [Innis] of his Miranda rights. [Innis] replied that he understood those rights but that he "wanted to get the gun out of the way because of the kids in the area in the school." [Innis] then led the police to a nearby field, where he pointed out the shotgun under some rocks by the side of the road.
 
 
 46
 Id. at 295, 100 S.Ct. at 1687.
 
 
 47
 Innis was subsequently indicted for murder and robbery. On a full evidentiary hearing, the trial court found that Innis had been repeatedly advised of his rights and that his decision to waive them was knowing and intelligent. The trial court also made a credibility finding--which the Supreme Court accepted--that the police remarks were a sincere voicing of their concern for the children's safety, and were not intended to produce any response from Innis. Therefore, the evidence was admitted.
 
 
 48
 On appeal, the Supreme Court of Rhode Island held, 3 to 2, that even though Innis had not been intentionally addressed, he had been subjected to "subtle coercion" that was the equivalent of "interrogation" under Miranda, and that under those circumstances he had not waived his rights. It reversed. The Supreme Court granted certiorari "to address for the first time the meaning of 'interrogation' under Miranda v. Arizona. 440 U.S. 934 [99 S.Ct. 1277, 59 L.Ed.2d 492]." Id. at 297, 100 S.Ct. at 1688.
 
 
 49
 Referring to the point at which the fact of "interrogation" becomes important, Justice Stewart said:
 
 
 50
 The starting point for defining "interrogation" in this context is, of course, the Court's Miranda opinion. There the Court observed that "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."
 
 
 51
 Id. at 298, 100 S.Ct. at 1688 (citation omitted).
 
 He further wrote:
 
 52
 We conclude that the Miranda safeguards come into play whenever a person in custody is subject to either express questioning or its functional equivalent. This is to say, the term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.
 
 
 53
 Id. at 300-301, 100 S.Ct. at 1689-1692. (Emphasis supplied) (footnotes omitted).
 
 
 54
 Therefore, under Innis, interrogation within Miranda's requirements applies (1) to express questioning or (2) to the "functional equivalent" thereof. Words or action by police are the "functional equivalent" of express questioning when police should know that their words or actions are reasonably likely to elicit an incriminating response.
 
 
 55
 There was of course no direct questioning in Innis, and the Court accepted the finding that the officers' conversation was in no sense directed at Innis as he sat in the rear compartment:
 
 
 56
 Rather, that conversation was, at least in form, nothing more than a dialogue between two officers to which no response from [Innis] was invited.
 
 
 57
 Id. at 302, 100 S.Ct. at 1690 (emphasis added).
 
 
 58
 The opinion takes pains to state in a footnote that "the record in no way suggests that the officers' remarks were designed to elicit a response." Id. at 303, n. 9, 100 S.Ct. at 1691, n. 9 (Emphasis in original). Justice Stewart concluded:
 
 
 59
 Given the fact that the entire conversation appears to have consisted of no more than a few offhand remarks, we cannot say that the officers should have known that it was reasonably likely that Innis would so respond. This is not a case where the police carried on a lengthy harangue in the presence of the suspect. Nor does the record support the respondent's contention that, under the circumstances, the officers' comments were particularly "evocative." It is our view, therefore, that the respondent was not subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him.
 
 
 60
 Id. at 303, 100 S.Ct. at 1691 (emphasis added).
 
 
 61
 In his separate dissent, Justice Stevens argued that a standard requiring that it be shown that police should have known the remarks were likely to elicit an incriminating response was too strict. He thought the standard should be that "any statement that would normally be understood by the average listener as calling for a response is the functional equivalent of a direct question, whether or not it is punctuated by a question mark." Id. at 309, 100 S.Ct. at 1693 (Stevens, J., dissenting).
 
 
 62
 Innis differs from Jackson's case. The trial court found that McNabb did intend to get a response from Jackson. McNabb said so in plain words. He believed, reasonably, that in the prevailing circumstances, provocative statements would prompt reckless responses. After the initial verbal attack did have the expected result, McNabb repeated it to make certain that the response was confirmed. The prohibition, as clearly stated in Miranda and Innis, applies without distinction whether the words intended to be elicited are or are not incriminating. If truly exculpatory, of course, they would not on their face be useful to the prosecution. If the prosecution can use them as part of its case, then by definition that use is probably adverse to the defendant.
 
 
 63
 It is almost axiomatic in criminal investigation that if a suspect is induced to talk at all, he is likely to hurt his case. Here McNabb baited Jackson to obtain an incriminating response and Jackson took the bait. The trial judge thought that no response was excludable which had not occurred during "coercive" custody, or which was not the product of formal, high-pressure police interrogation. Consequently, it held irrelevant the fact that McNabb had deliberately set about goading his prisoner into a response. That is not acceptable, for while Innis requires some reasonable likelihood that the police effort would elicit some response--whether or not it turned out to be inculpatory--intent and design are also significant in the overall context:
 
 
 64
 This is not to say that the intent of the police is irrelevant, for it may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response. In particular, where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect.
 
 
 65
 Id. at 301-302, n. 7, 100 S.Ct. at 1689-1690, n. 7.
 
 
 66
 Applying these standards, we determine that McNabb's words constituted custodial interrogation or its functional equivalent, and in either case were impermissible. After first asking an express question--"you got any dope?"--he taunted Jackson with being a "pimp and doper," and then twice charged "you're the one who sells dope to little black children." It seems to us reasonably beyond argument that the conduct was designed and reasonably likely to evoke response in kind, damaging, in this instance, and quickly recorded by McNabb for later use.
 
 
 67
 The trial court termed McNabb's words "sarcastic and even heated response to Jackson's slander, in which [both] speakers finally descended to racial remarks and slurs." RT 528-529. In the court's view, McNabb's taunts were merely defensive, while Jackson was to be bound by the literal words of his response. The judge summed it all up:Here, slander [by Jackson] plus sarcasm [by McNabb] equals a serendipity[8] for the Government.
 
 
 68
 RT 531. We disagree. The responses were not an uninvited volunteer, as in Innis. It was not the random turn of fortune's wheel that netted the policeman his prize, but a calculated ploy. We hold rather that the conduct could reasonably be expected to elicit, as it did, incriminating responses from the subject in custody. That evidence therefore should have been excluded under Miranda and Innis.
 
 
 69
 Further, we conclude that this testimony was inherently likely to inject prejudice and animosity into Jackson's trial. He gave no substantive evidence, and the sole content of his testimony was to depict him as a bad man because of his vulgar statements on the street. The offensive language ascribed to Jackson had insubstantial tendency to prove him a member of the Government-charged conspiracy, and did not relate to any of the substantive counts against him. The alleged hit-run (which disappeared from mention after McNabb concluded his testimony) had no connection with the case. The several provocative accusations that Jackson was a "pimp and doper" and that he "sells to little black children" were neither charged nor proved. And the statements about "white bitches" and "whores" and "honkies" were shocking and irrelevant issues introduced into a trial of these black defendants along with many exhibits and much witness testimony commenting on their lifestyles, evidence of wealth, and general demi-monde characters. It is precisely this collateral sort of information which Rule 403 of the Federal Rules of Evidence seeks to exclude. The necessary effect of letting it in was to charge unrelated criminality and to attribute despicable conduct upon the defense. The judge ought not to have allowed into evidence over vigorous and timely objections what he had himself termed "racial slurs," in view of the potential appeal to passion and prejudice.
 
 
 70
 The Rules of Evidence seek to disallow the prosecution to introduce testimony designed solely to reveal instances of a defendant's separate bad conduct and his vulgar reactions to a policeman's accusation made while in that officer's custody. In view also of the sweep of conspiracy instructions to the effect that each co-conspirator is responsible for and is bound by the acts and declarations of his co-conspirators made during and in furtherance thereof, we cannot always know that juries will restrict their consideration of potentially prejudicial evidence solely to the co-defendant against whom it is said to be admitted. When that evidence ought not to have been admitted at all, the danger of misused in increased.
 
 
 71
 At least with respect to Jackson, we hold that the court abused its discretion in admitting the McNabb testimony, and that it is not salvageable by invocation of the harmless error doctrine. That testimony had a direct tendency to distort the trial by its appeal to the fears and passions of the jury. We reverse Jackson's conviction because of that error for we cannot escape the conclusion that the verdict against him was affected in substantial measure by the admission of that prejudicial evidence.
 
 II.
 Admission of Polygraph Evidence
 
 72
 As we have said, the Government's evidence was sufficient to establish the existence of a conspiracy and the appellants' connections therewith. Its strength, however, depended upon the testimony of "inside" witnesses, including especially Johnny Williams and Philip Stephens (originally indicted but severed before trial, and later dismissed), and Wanda Sloan. Convincing the jury of their credibility was essential to the prosecution, for without them the case was open to doubt.
 
 
 73
 The defendants vigorously challenged the accuracy and truthfulness of these witnesses. They strongly attacked the accounts given by Williams who testified that he had been one of the "Portland-based conspirators" (Brief of Plaintiff-Appellee at 16) who frequently traveled back and forth between Portland and Los Angeles or sent couriers, and acquired heroin from Defendant Waddy through intermediaries defendants Crutchfield and Woods. It was the Government's theory that contraband thus purchased was transported by plane, train and automobile, frequently by courier-defendants Stephens, Larry Crawford, Aaron Mosely and Norman Moore. Witness Wanda Sloan also gave testimony establishing the conspiracy.
 
 
 74
 The evidence of each of the three "insiders" was critical for each claimed to have participated in the acts charged by the indictment. To secure their cooperation the Government had entered into plea-bargain agreements setting forth in writing the quid pro quo flowing to and from the Government and the witnesses. Each agreement provided that the witness would receive specified benefits by way of recommended dismissal or reduction of charges or other favorable treatment. Each document contained an identical commitment by the witness that he or she
 
 
 75
 Further agrees to submit to a Polygraph test at such time or times to be designated by the Government.
 
 
 76
 Government Exhibits M-176 (Williams), M-155 (Stephens) and M-166 (Sloan).
 
 
 77
 The existence of the polygraph provision of the plea-bargain agreements was deliberately brought to the jury's attention by the Government during its examination of Johnny Williams. The prosecutor first elicited from him that his testimony was given pursuant to a written plea-bargain agreement between himself and the Government; that certain consideration had been promised in exchange for the witness' testimony. The witness testified that all promises by the prosecution had been reduced to writing. At the conclusion of Williams' direct evidence, the prosecutor offered the entire document into evidence. The defense objected and the court reserved ruling at that stage.
 
 
 78
 Cross-examination followed in which, according to the Government's brief (Brief for Plaintiff-Appellee at 71-72), defense counsel implied: (1) that the Government had made additional promises to the witness which were not set forth in the agreement; (2) that before the plea agreement had been made, the prosecution had given "assistance" to one witness in connection with certain state court charges; (3) that promises had been made before the document had been executed which were not put in the writing and (4) that in a separate prior criminal matter, the Government had conferred a benefit on one witness which had not been mentioned in the agreement.
 
 
 79
 The Government states that "to combat this defense assault and accurately place before the jury the complete agreement, the Government again offered [the Williams plea-bargain document]" and it was admitted by the court. It was then that the prosecutor brought before the jury the evidence of the polygraph clause. He asked Williams:
 
 
 80
 Q. (By the Government) Does [the plea agreement] require that you testify fully and truthfully in this case and at any hearing or Court proceeding ancillary thereto?
 
 
 81
 A. Yes.
 
 
 82
 Q. Does it also agree that you submit to a polygraph * * * (Emphasis added).
 
 
 83
 MS. SNYDER (Defense Counsel): Objection.
 
 
 84
 MR. MARGOLIN (Defense Counsel) I have a motion, Your Honor.
 
 
 85
 THE COURT: Wait a minute. One at a time, please.
 
 
 86
 Mr. Wong, if the document is admitted, why do we need to go over it at this moment?MR. WONG: We don't, Your Honor. I would offer it again and ask that it be received.
 
 
 87
 (Whereupon, Plaintiff's Exhibit No. M-176 was thereupon received into evidence.)
 
 
 88
 MR. WONG: And I ask that the jury be allowed to receive it.
 
 
 89
 THE COURT: It will be received.
 
 
 90
 MR. WONG: Thank you, Your Honor. May the Jury be allowed to see it.
 
 
 91
 THE COURT: Not now.
 
 
 92
 MR. MARGOLIN: Can I have a motion at the appropriate time, Your Honor?
 
 
 93
 THE COURT: Yes, Sir.
 
 
 94
 MR. MINKIN (Defense Counsel): I would like to have that right also, Your Honor.
 
 
 95
 On recross-examination of Williams, one counsel renewed the colloquy:
 
 
 96
 Q. Now, is it not true that there were other promises made to you which are not in this agreement?
 
 
 97
 A. No.
 
 
 98
 RT at 1582.
 
 
 99
 The Government states that the relevant "direct and cross examination of witnesses Stephens and Sloan regarding their agreements was nearly identical to that concerning Williams." (Government Brief, at 72).
 
 
 100
 After the court ruled that the Williams' exhibit containing reference to the polygraph would be admitted, the prosecutor asked immediate permission to read its entirety. The court would not grant that request, indicating that the content would be before the triers of fact in due course. Objections to the document (and those relating to witnesses Stephens and Sloan) were timely but all were overruled. The defense requested the court to excise or redact the offensive clauses. The assistant United States attorney, who had already placed before the jury the existence of a polygraph provision, opposed redaction and was successful in keeping the language intact in the three documents. The court refused to excise the clause and the agreements eventually went to the jury without cautionary instruction or guidance of any sort.
 
 Prosecution Use of the Polygraph Clauses
 
 101
 The government argues that admission of the plea-bargain agreements without redaction was justified because of the defense insinuations that the witnesses had been given promises over and above those in the writings as inducements to turn for the prosecution. It cites to Rule 106 of the Federal Rules of Evidence as authority. That "rule of completeness" (See Notes of the Advisory Committee) provides that when only part of a writing has been introduced by one party, the other party is entitled to have in as much of the rest of the writing or statement as "ought in fairness to be considered contemporaneously with it." The trial judge evidently had this rule in mind when admitting the whole documents.
 
 
 102
 The difficulty with that reasoning is that the predicate for triggering Rule 106 was lacking. The essence of the rule is:
 
 
 103
 that a statement be admitted in its entirety when this is necessary to explain the admitted portion, to place it in context, or to avoid misleading the trier of fact, * * * [citations omitted] or to ensure a "fair and impartial understanding" of the admitted portion, [citation omitted]. The completeness doctrine does not, however, require introduction of portions of a statement that are neither explanatory of nor relevant to the admitted passages.
 
 
 104
 United States v. Marin, 669 F.2d 73, 84 (2d Cir.1982). By the time of cross-examination, defense counsel were fully aware of the existence of the plea-bargain agreements and of the purport of their terms. Their attacks were not limited to the promises by the Government which were in the writings, but on alleged promises which were left out. See Brief of Appellee at 72. Defense suggestions that there were considerations not mentioned in the writings could not be rebutted by inspection of the [alleged] incomplete document itself.
 
 
 105
 Furthermore, it is clear from the use actually made by the Government of the unredacted documents, once admitted, that the prosecutor's successful battle to get in the text of the documents was not simply to "complete the picture" of distortions by the cross-examination concerning the scope of the promises. Rather it was for the substantive value of tying the witnesses' promises always to be truthful with the mechanical effectiveness of the polygraph. The Government argued at length, vigorously and effectively, that the jury could believe the testimony given by the three main witnesses because the binding force of the plea-bargain guaranteed their veracity. It was not simply that those persons could be counted on, as manifest by their character, to keep their bargain, but that the contract contained a mechanism to keep them honest. In that linkage lay the operative core of the plea agreements and their forensic value.
 
 
 106
 Here, as in United States v. Roberts, 618 F.2d 530 (9th Cir.1980), the commitment-to-truth stood not alone, but in the guardian presence of detection by polygraph. The record shows the Government repeatedly inviting the jury to find, in the four corners of the writings, why each "inside" witness, though tempted to perjury, could not leave the paths of truth. Williams, the prosecutor said, "had every pressure on [him] to tell the truth and every pressure on him not to fabricate. I say that because of the plea agreement, [M-176]." (Emphasis added). RT at 4979.[9] Later, with respect to its effect on Stephens, the prosecutor again invited the jury's attention to the document, which he said "put every pressure upon [Stephens] to tell the absolute truth on the witness stand. * * * "[10] (Emphasis added.)
 
 
 107
 We indeed find it somewhat surprising that the government was from the beginning insistent on admitting the unredacted polygraph recitals in view of this circuit's "inhospitable" disposition towards proffers of polygraph evidence. See United States v. Demma, 523 F.2d 981, 987 (9th Cir.1975) (en banc). See also United States v. Benveniste, 564 F.2d 335, 339 (9th Cir.1977); United States v. Marshall, 526 F.2d 1349 (9th Cir.) cert. denied, 426 U.S. 923, 96 S.Ct. 2631, 49 L.Ed.2d 376 (1976); United States v. DeBetham, 470 F.2d 1367, 1368 (9th Cir.1973); United States v. Salazar Gaeta, 447 F.2d 468, 469 (9th Cir.1971); United States v. Sadrzadeh, 440 F.2d 389 (9th Cir.1971). Our unbroken history of rejection of polygraph evidence when offered for its substantive value buttresses our holding here that admission of the polygraph recitals was error, and that the use made of them by the Government constituted impermissible vouching for the credibility of its witnesses.
 
 
 108
 We find the form of vouching particularly invidious in this case. Although the prosecutors--after the existence of the polygraph factor had been first let out--avoided explicit reference to the instrument which was then in evidence for inspection, the inferential references were clear and repeated. We hold that it was improper for the court to allow the Government to argue, and the jury to hear, read, and infer, that the threat of exposure of any falsity by means of such an instrument assured the accuracy of the Government's key witnesses. We have said that "the prosecutor may not imply that the Government has taken steps to assure the veracity of its witnesses." United States v. Berry, 627 F.2d 193, 198 (9th Cir.1980) (argument that Government had kept its witnesses apart and that each was "untainted by the other," which was not objected to, was improper but not enough, in that case, to invoke "plain error" rule). The Government may not vouch that the witness should be believed either by putting its own prestige behind the witness, or by indicating that extrinsic information not presented in court supports the witness' testimony. United States v. Roberts, 618 F.2d 530 (9th Cir.1980) cert. denied, 452 U.S. 942, 101 S.Ct. 3088, 69 L.Ed.2d 957 (1981) (Roberts I ).
 
 
 109
 In Roberts I, the prosecution argued to the jury that the presence in the courtroom of an officer, whose mission was to monitor the testimony of a Government witness, gave assurance that that witness would faithfully carry out his plea bargain pledge of truthfulness. We reversed, saying:
 
 
 110
 The prosecutor in this case referred to evidence not in the record by declaring that Detective Sellers was monitoring Adamson's testimony. The jury could naturally believe that Sellers had personal knowledge of relevant facts and was satisfied that these facts were accurately stated by Adamson. In effect, the prosecutor was telling the jury that another witness could have been called to support Adamson's testimony. This was error. United States v. Morris, 568 F.2d 396 (5th Cir.1978) (improper to imply witness not called supports the prosecution). Reichert v. United States, 359 F.2d 278 (D.C.Cir.1966) (improper to refer to witness's statements not introduced into evidence).
 
 
 111
 Roberts I, 618 F.2d at 534 (footnote omitted). Further, while the trial judge had sustained objections to some of the prosecutor's insinuations, we said that the situation "called for stern rebuke and repressive measures and, perhaps, if these were not successful, for the granting of a mistrial." Id.
 
 
 112
 Roberts I also recognized a growing practice in which prosecutors, after artful drafting of plea bargain agreements, containing elaborate recitals of the witness' promises of truthfulness, seek admission of the entire document in jury trials without excising those self-serving portions. We reviewed the treatment of this issue by other circuits and concluded that under appropriate circumstances the text of a plea bargain may be admissible "fully and placed in context so that the jury is not misled about its terms or importance." Id. at 535. See also United States v. Halbert, 640 F.2d 1000 (9th Cir.1981). But we cautioned that "[e]vidence is not admissible, however, simply because it is contained in or is offered to explain a plea agreement." Roberts I, 618 F.2d at 535. And further, we warned that the trial court "must weigh the probative value of the evidence against its prejudicial impact and against the possibility the jury will use the evidence improperly," id. at 536, adding:
 
 
 113
 A strong case can be made for excluding a plea agreement promise of truthfulness. The witness, who would otherwise seem untrustworthy, may appear to have been compelled by the prosecutor's threats and promises to come forward and be truthful. The suggestion is that the prosecutor is forcing the truth from his witness and the unspoken message is that the prosecutor knows what the truth is and is assuring its revelation.
 
 
 114
 Conveying this message explicitly is improper vouching. Lawn v. United States, 355 U.S. 339, 359-60 n. 15, 78 S.Ct. 311, 323 n. 15, 2 L.Ed.2d 321 (1958), Gradsky v. United States, 373 F.2d 706, 710 (5th Cir.1967) (improper to imply government checks for credibility before using witness). We conclude that conveying it by implication is equally improper.
 
 
 115
 A trial court should be alert to the problem of vouching before admitting a plea agreement containing a promise to testify truthfully. The court should consider the phrasing and content of the promise to ascertain its implications and decide whether an instruction to the jury would dispel any improper suggestions.
 
 
 116
 * * *
 
 
 117
 * * *
 
 
 118
 Id.
 
 
 119
 We need not condemn entirely the admission of plea bargain promises of truth, as such, because here the promises were augmented by and intimately coupled with other material which we hold constituted inadmissible prosecution "overkill." United States v. Arroyo-Angulo, 580 F.2d 1137, 1150 (2d Cir.1978) (Friendly, C.J., concurring opinion).
 
 
 120
 Admission in this case of the reference to the polygraph waiting in the wings, and the use in argument of its provisions combined to create errors which we believe infected the whole case. It is correct that the Government's subsequent arguments carefully avoided repeating the words of the polygraph clause. But that was unnecessary because the prosecutor had already referred to "polygraph" in the jury's hearing, and the full text, including the clause providing for examination at the Government's election, was before the jury while it deliberated the truth of the witnesses' testimony. The jury could well have decided to believe the witnesses without the back-up of "lie detector" evidence. But, taken as a whole, the plea-bargain agreement, like a covenant of faith, told them that the prosecution stood ready at all stages to bring the witnesses to account should they stray from the truth. It gave assurance not only that the witnesses were truthful when the prosecution decided to put them on the stand, but also that their revelations to the jury could be believed because of the threat of certain exposure. That resource, like a bright line to honesty, suggests that the scientific apparatus can tell the difference. It also opens the intimation that the Government knows that its witnesses have told and are telling the truth because otherwise they would not have been offered as witnesses. Further, the jury may be led to think that should their jury testimony later be found false even after leaving the witness stand, the Government surely would know and surely would act to purge any falsity from the record.
 
 
 121
 In United States v. Bursten, 560 F.2d 779 (7th Cir.1977), a key witness in a criminal fraud case, Lesniak, had entered a plea bargain calling for his readiness to submit to polygraph checking of his promise to make full disclosure about the matters to which he was to testify. Over objection, the court allowed the entire document to go to the jurors. Lesniak had not in fact taken the test. On appeal, the Government argued as here, that the entire document was receivable to counter the defense argument that Lesniak had lied about the defendant to save his own skin. The Government frankly rationalized that the polygraph evidence, while not admissible to prove truth or falsity, was probative for purposes of demonstrating that Lesniak was bound to truthfulness "by the knowledge that he was subject to a lie detector test at any time." 560 F.2d at 785.
 
 
 122
 The Bursten court rejected that refinement of reason. Its opinion examines the basis of the "consistent rejection by federal courts of the results obtained through the use of such 'truth-determining' devices." It pointed out that the polygraph monitoring provision in a plea bargain agreement is not simply an administrative tool for evaluating pre-trial facts and coming to a prosecutive decision:
 
 
 123
 * * * Despite the Government's attempt to nicely distinguish trial from pre-trial credibility of a witness' statements, the sole purpose for pursuing admission of the disputed sentence could only have been to strengthen Lesniak's story in the jury's estimation. If the Government was permitted to show that Lesniak had been intimidated into truthfulness prior to trial by the ever-present possibility of a polygraph examination, then the inescapable inference is that his same story at trial is also true. Counsel for the Government stated during oral argument that the inclusion of similar paragraphs regarding potential polygraph examination in plea agreements is a routine practice. Given the awesome powers which the prosecution may wield in order to insure veracity of its witnesses' statements, we strongly condemn this superfluous practice. Prosecutors who introduce such evidence in the future to obtain convictions should expect reversal.
 
 
 124
 Id.
 
 
 125
 The Government reminds us that the Bursten court, while promising to reverse future cases involving lie detector references, did not reverse that conviction. We will not speculate why. In this case we have pointed out the close connection in the prosecution's argument between the witnesses' promise of truthfulness and the existence of polygraph controls. Whatever may have persuaded the Bursten court to stay its hand, we find the situation here different and more aggravated and calling for a different conclusion.
 
 
 126
 We reversed in Roberts I because we were not persuaded that it was more probable than not that the error did not materially affect the verdict. United States v. Valle-Valdez, 554 F.2d 911 (9th Cir.1977). We have made it clear that with its immense prestige and awesome resources of power, the Government may not strengthen its courtroom hand by communicating to the jury that it has ways and means by which it can "know" that its own case is true. We have no doubt that that was the message which the prosecutors fought to send and did convey in this case. In doing so, fair trial was lost.
 
 
 127
 The appellants may indeed have committed the crimes charged by the Government. We express no opinion on what may ultimately be found. But we do hold that they are entitled to have that adjudication established only in a trial that is fair. We have concluded this trial failed that requirement. Viewing the impact of the foregoing errors, and to the extent they may be said not to be of constitutional dimension, we deem it "more probable than not that [they] materially affected the verdict[s] * * *." United States v. Mouton, 617 F.2d 1379, 1385 (9th Cir.1980); United States v. Valle-Valdez, 554 F.2d 911, 916 (9th Cir.1977).
 
 III.
 Other Claims of Error
 
 128
 Since we remand for new trial we note briefly our disposition of the principal additional claims of error advanced by appellants.
 
 1. Pre-Indictment Delay
 
 129
 We find no showing of prejudice accrued from the delay of three months between the grand jury testimony by Williams and the Williams-Jackson transactions.
 
 2. Grand Jury Improprieties
 
 130
 None of the claimed improprieties were sufficiently flagrant to call for dismissal of the indictment. United States v. Seifert, 648 F.2d 557 (9th Cir.1980). Nor was there a showing that testimony material to the return of the indictment was perjured. United States v. Lasky, 600 F.2d 765, 768 (9th Cir.1979); United States v. Bracy, 566 F.2d 649, 654 (9th Cir.1977).
 
 3. Speedy Trial
 
 131
 The district court complied with 18 U.S.C. Sec. 3161(h)(8) in determining that the delay was excludable under the Speedy Trial Act.
 
 
 132
 There was no violation of appellants' Sixth Amendment speedy trial rights.
 
 4. Joinder and Severance
 
 133
 Since the offenses charged arose out of the same series of transactions, joinder was proper. United States v. Ford, 632 F.2d 1354, 1371 (9th Cir.1980). No abuse of the court's discretion in refusing severance was shown. United States v. Seifert, 648 F.2d at 563.
 
 5. Bills of Particulars
 
 134
 Denial of a bill of particulars was not an abuse of discretion. The allegation of Count V, against Moore, that the "transaction occurred during the first part of 1976," was not defective on the ground that it failed to place the act "in any time frame whatsoever." United States v. Tavelman, 650 F.2d 1133, 1137 (9th Cir.1981).
 
 6. Discovery of Defense Case
 
 135
 There was neither abuse of discretion nor manifest prejudice in the court's order allowing the Government to obtain copies of documents subpoenaed by the appellants.
 
 7. Jail Clothing--Jackson
 
 136
 The clothing worn by Jackson was not readily identifiable as jail clothing. At any event, he had an opportunity to change.
 
 
 137
 No prejudice resulted.
 
 8. Two Conspiracies
 
 138
 The evidence was sufficient to support the claim that there was but a single conspiracy. The court properly instructed the jury on the distinction between single and multiple conspiracies and how the jury should deal with the proof if they found multiple conspiracies. United States v. Eubanks, 591 F.2d 513, 518 (9th Cir.1979).
 
 
 139
 9. Leading Questions and "Irrelevant" Evidence
 
 
 140
 Permitting leading questions on direct examination is generally within the trial court's discretion. We find no abuse. Nor do we find abuse of discretion in the court's overruling Harris' objections that the records of Cabana Motel and other documents were irrelevant.
 
 10. "Highlighted" Exhibits
 
 141
 "Highlighting" by drawing transparent colored lines through certain parts is not desirable and could be misleading, but we find it highly unlikely that the practice here affected the verdict.
 
 11. Roush's Testimony and Summaries
 
 142
 The admission of this evidence was not "manifestly erroneous" under Fed.R.Evid. 702 and could provide help to the jury. United States v. Tsinnijinnie, 601 F.2d 1035, 1040 (9th Cir.1979); United States v. Moore, 604 F.2d 1228, 1235 (9th Cir.1979).
 
 12. Other Crimes Evidence
 
 143
 Testimony that heroin was obtained from sources other than those established as the normal framework of the conspiracy was reasonably probative of general plan and operations. As we have indicated, admissibility of other offenses is always open to scrutiny for relevance and prejudice, but is largely within the court's discretion.
 
 13. Testimony of Officer Wright
 
 144
 The testimony concerning the appearance of the home of appellant Jackson was offered to show "unexplained wealth." We have adverted above to the risk of undue emphasis on this manner of proof. However, there is some probative value in such evidence if kept within reasonable bounds under the court's control. Since the specific evidence which we have held was improperly admitted will not again be offered, we find it unnecessary at this time to define the limits of Federal Rule of Evidence 404(b).
 
 14. Searches and Seizures at Moore's Home
 
 145
 The affidavit for search warrant was sufficient and legally specific. The daylight entry was reasonable under 18 U.S.C. Sec. 3109. United States v. Phillips, 497 F.2d 1131, 1134 (9th Cir.1974).
 
 
 146
 The officers' belief that there might be weapons present which could endanger their safety was not unreasonable and justified their search for "instruments of assault." See United States v. Hill, 545 F.2d 1191, 1193 (9th Cir.1976); United States v. Hobson, 519 F.2d 765, 776 (9th Cir.1975).
 
 
 147
 The Park-Moore colloquy is less clear than the facts of Jackson's case. If on retrial the Government cannot show a knowing and intelligent waiver of Moore's Miranda rights, the colloquy testimony would be subject to exclusion.
 
 
 148
 15. Ex Parte, In Camera Proceedings, and Withholding Grand Jury Materials
 
 
 149
 The court did not abuse its discretion in withholding the identities of witnesses as to whom the ex parte, in camera proceedings showed there was likelihood of violence. United States v. Clardy, 540 F.2d 439, 442 (9th Cir.1976). Neither was its discretion abused in not unsealing transcripts of persons who appeared before the Grand Jury but were not called as trial witnesses. Ingle v. United States, 399 F.2d 690, 691 (9th Cir.1968). And appellants failed to show that the withheld files on Alberta Brown were material. Fed.R.Crim.Proc. 16(a)(1)(C).
 
 16. Specific Claims of Error by Brown
 
 150
 The hearsay objections were without merit. Some statements were not offered for their truth; one was admissible as an alleged admission; others could reasonably be viewed as declarations in furtherance of the conspiracy.
 
 
 151
 Brown showed no reasonable expectation of privacy in the premises at 4624 N.E. Cleveland Street, and therefore cannot challenge the search.
 
 
 152
 Brown did not specify the proceedings from which he claims absence, and shows no prejudice therefrom.
 
 
 153
 Admissibility of Brown's photograph and of the motel registration could reasonably be held more probative than prejudicial. United States v. Brannon, 616 F.2d 413, 418 (9th Cir.1980).
 
 17. Sufficiency of the Evidence
 
 154
 We have heretofore held the evidence was sufficient and no useful purpose is to be served by detailing the various arguments to the contrary since we have reversed for reasons other than sufficiency.
 
 
 155
 The judgments of conviction are reversed as to each appellant, and the cases are remanded to the district court for such further proceedings consistent with this opinion as may be appropriate.
 
 
 156
 REVERSED AND REMANDED.
 
 APPENDIX A
 Summary of Charges in Indictment
 
 157
 Count I: Conspiracy.
 
 
 158
 Count II: Travel in interstate commerce in January, 1976, by BOBBY JOE MOORE, PHILIP TYRONE STEPHEN, and JOHNNY R. WILLIAMS, JR., to facilitate conspiracy to possess heroin with intent to distribute, and possession with intent to distribute in violation of 21 U.S.C. Secs. 841(a)(1) and 846; and 18 U.S.C. Sec. 1952.
 
 
 159
 Aided and abetted by ALLEN LOUIS CRUTCHFIELD.
 
 
 160
 Count III: Distribution of heroin; early 1976, by AARON G. MOSLEY; 21 U.S.C. Sec. 841(a)(1).
 
 
 161
 COUNT IV: Distribution of heroin; early 1976, by DANIEL HARVEY, III; 21 U.S.C. Sec. 841(a)(1).
 
 
 162
 COUNT V: Distribution of heroin; early 1976, by BOBBY JOE MOORE; 21 U.S.C. Sec. 841(a)(1).
 
 
 163
 COUNT VI: Distribution of heroin; Summer, 1976, by SHERMAN EDWARD JACKSON; 21 U.S.C. Sec. 841(a)(1).
 
 
 164
 COUNT VII: Travel in interstate commerce, Fall, 1976, by CONWAY D. WADDY and JEROME H. WOODS, to facilitate conspiracy to possess heroin with intent to distribute and possession with intent to distribute; 21 U.S.C. Secs. 841(a)(1), 846; and 18 U.S.C. Sec. 1952.
 
 
 165
 Aided and abetted by JEROME H. WOODS.
 
 
 166
 COUNT VIII: Use of communication facility (telephone) on February 23, 1977, by JOHNNY R. WILLIAMS, JR., to facilitate distribution of heroin; 21 U.S.C. Secs. 841(a)(1), 846 and 843(b).
 
 
 167
 Aided and abetted by JEROME H. WOODS.
 
 
 168
 COUNT IX: Use of communication facility (telephone) on February 24, 1977, by JOHNNY R. WILLIAMS, JR., to facilitate distribution of heroin; 21 U.S.C. Secs. 841(a)(1), 846, and 843(b).
 
 
 169
 Aided and abetted by JEROME H. WOODS.
 
 
 170
 COUNT X: Travel in interstate commerce on February 24, 1977, by DANIEL HARVEY, III, and JOHNNY R. WILLIAMS, JR., to facilitate conspiracy to possess heroin with intent to distribute, and possession with intent to distribute, in violation of 21 U.S.C. Secs. 841(a)(1) and 846; and 18 U.S.C. Sec. 1952.
 
 
 171
 Aided and abetted by JEROME H. WOODS.
 
 
 172
 COUNT XI: Travel in interstate commerce on June 2, 1977, by BOBBY JOE MOORE and JOHNNY R. WILLIAMS, JR., to facilitate conspiracy to possess heroin with intent to distribute, in violation of 21 U.S.C. Secs. 841(a)(1) and 846; and 18 U.S.C. Sec. 1952.
 
 
 173
 Aided and abetted by ALLEN LOUIS CRUTCHFIELD.
 
 
 174
 COUNT XII: Possession of heroin with intent to distribute by ROTHEY ALVIN MANUS, October 5, 1977; 21 U.S.C. Sec. 841(a)(1).
 
 
 175
 Count XIII: Possession of heroin with intent to distribute by ROTHEY ALVIN MANUS, October 7, 1977; 21 U.S.C. Sec. 841(a)(1).
 
 
 176
 COUNT XIV: Possession of heroin with intent to distribute by ROTHEY ALVIN MANUS, October 11, 1977; 21 U.S.C. Sec. 841(a)(1).
 
 
 177
 COUNT XV: Use of communication facility (telephone) on November 13, 1977, by BOBBY JOE MOORE, to facilitate distribution of heroin; 21 U.S.C. Secs. 841(a)(1), 846, and 843(b).
 
 
 178
 Aided and abetted by CONWAY D. WADDY.
 
 
 179
 COUNT XVI: Use of communication facility (telephone) on November 13, 1977, by BOBBY JOE MOORE, to facilitate distribution of heroin; 21 U.S.C. Secs. 841(a)(1), 846 and 843(b).
 
 
 180
 Aided and abetted by CONWAY D. WADDY.
 
 
 181
 COUNT XVII: Travel in interstate commerce, November, 1977, by BOBBY JOE MOORE and PHILIP TYRONE STEPHENS, to facilitate conspiracy to possess heroin with intent to distribute, and possession with intent to distribute, in violation of 21 U.S.C. Secs. 841(a)(1), 846; and 18 U.S.C. Sec. 1952.
 
 
 182
 Aided and abetted by CONWAY D. WADDY.
 
 
 183
 COUNT XVIII: Use of communication facility (telephone) on July 20, 1978, by ALLEN LOUIS CRUTCHFIELD, to facilitate distribution of heroin, 21 U.S.C. Secs. 841(a)(1), 846, and 843(b).
 
 
 184
 COUNT XIX: Distribution of heroin on February 20, 1978, by SHERMAN EDWARD JACKSON; 21 U.S.C. Sec. 841(a)(1).
 
 
 185
 COUNT XX: Distribution of heroin on February 28, 1979, by SHERMAN EDWARD JACKSON; 21 U.S.C. Sec. 841(a)(1).
 
 
 186
 COUNT XXI: Distribution of heroin on March 2, 1979, by SHERMAN EDWARD JACKSON; 21 U.S.C. Sec. 841(a)(1).
 
 APPENDIX B
 Testimony of John McNabb
 
 187
 (RT Vol. V, Oct. 22, 1979, pp. 873-890)
 
 
 188
 John McNabb, a Portland police sergeant, was permitted to testify about an incident which involved defendant Sherman Jackson on an occasion unrelated to the charges in the indictment. Another officer, in a police car, announced over the radio that he was behind a hit and run car and McNabb then drove to join him. He stated that he observed a black Lincoln (Jackson's car) pull over to the corner with the traffic officer's car behind it. Jackson got out from the driver's side and was recognized by McNabb. It appeared that the "hit and run" report was insubstantial and the charges thereon were eventually dismissed. McNabb, however, was permitted to give some extremely damaging testimony about wild and intemperate statements attributed to Jackson. Upon McNabb's approach Jackson demanded that he be told who was accusing him of hit and run with that other automobile and he be shown the existence of any evidentiary damage marks on his own car. McNabb advised that he knew nothing about the incident and had no information. McNabb gave the following testimony at page 877 of the reporter's transcript:
 
 
 189
 Q. Did you get involved with the conversation with Mr. Jackson?
 
 
 190
 A. I did shortly thereafter. As I approached the two, Mr. Jackson was making rather heated and loud demands of the traffic officer demanding that the traffic officer demonstrate damage on the back of the Lincoln to prove that he had been in a hit and run. About ten or twenty seconds after I first arrived to where the traffic officer and Mr. Jackson were talking, another police car arrived. Officer Cotton walked over to that police car and had a conversation with them that resulted in that police car going back to Freddie's place looking for the taxi cab which the traffic officer believed would be the victim of a hit and run. At that time I was standing over--I was left alone with Mr. Jackson, or at least the traffic officer was some distance away.
 
 
 191
 Q. Okay.
 
 
 192
 A. At that time a conversation between Mr. Jackson and myself took place.
 
 
 193
 Q. Would you tell us what that conversation was?
 
 
 194
 A. Mr. Jackson began demanding in an extremely heated and volatile manner demanding that I provide him with information about who was accusing him of hit and run and what other car he had been involved with. He began demanding that I show him damage on the back of his car. I told him that I didn't know anything about what had happened and I had no information to give him.
 
 
 195
 I encouraged him to relax and to calm down and to allow the traffic officer to gather whatever information he was going to gather. I told him the traffic car [sic] was conducting the investigation and that I wasn't.
 
 
 196
 By that time Mr. Jackson was pacing back and forth a short distance in front of me. He was yelling at me, referring to me by a variety of extremely obscene names and descriptions. As I said, he was pacing up and down in front of me. He would frequently stop and face me and assume a rather challenging posture by doubling his fist and spreading his legs. He began to accuse policemen in general--and me specifically--of harassing him. Throughout the time, throughout this time that I am describing, he carried on almost constantly a verbal tirade against me which was extremely loud and profane and obscene and abusive.
 
 
 197
 Q. Officer McNabb, do you remember some of the exact language that he used?
 
 
 198
 A. I do.
 
 
 199
 Q. Could you repeat it if necessary?
 
 
 200
 A. Yes.
 
 
 201
 Q. Okay. Go ahead with your narrative.
 
 
 202
 A. After a period of possibly a couple of minutes more of the conversation I just described, Mr. Jackson turned and began walking back towards his car. I directed him to wait, not to go back to the car. He said to me, at that time, and I am going to read some quotes from a police report that I wrote shortly after this incident--
 
 
 203
 [OBJECTION]
 
 
 204
 A. I ordered him to wait and not get back in his car. At that point he turned to me again and struck a challenging position, as I recall, his fists were clenched, his legs apart. He said to me, is there something else that I wanted.
 
 
 205
 At that time, I replied, and I am quoting, "Oh, I don't know, you got any dope." He became even more angry and volatile and loud at that time. And he moved a little closer to me, and he yelled at me and he said, "Yes, I have got some dope. You want to buy some." I told him at that time that I didn't want to buy any dope, but if he had any I would like to take it away from him. At that point, I was speaking to him in a conversational voice, much as I am talking now and that is the way I talked to him from the time I arrived until the time he and I parted that night.
 
 
 206
 At the point where I just stopped, Mr. Jackson was continuing to be extremely volatile, pacing back and forth, doubling his fists. He was occasionally challenging me verbally. At that time, I determined I was going to pat him down, check him for weapons. I told him of my intentions to do that. He raised his hands as of [sic] to threaten me. And he ordered me to keep--not to touch me. I explained to him that I had every right to search for weapons and I was determined to do so. I told him if he hit me or struck out at me that it would cost him a trip to jail. He continued to yell and scream at me, however. He submitted to a pat down search.
 
 
 207
 [At that point McNabb said he ordered Jackson to move from the traffic lane on to the sidewalk. The testimony continues (page 881) ]:
 
 
 208
 As we moved toward the sidewalk, he became, as I recall, even more outraged with me. He continued to scream and refer to me by abusive names, obscene names. As we arrived at the sidewalk, he made a comment to me, demanded I treat him like a man.
 
 
 209
 At that point, I told him, as far as I was concerned, he was acting like a typical pip [sic] and doper on the streets, as opposed to a man.
 
 
 210
 At that point he began bragging to me about his wealth. He indicated to me--told me he had several thousand dollars in his pockets. He told me I was too stupid to make any money; I was going to be in a blue uniform forever. He began displaying jewelry to me that he wore; he displayed one or two what appeared to be diamond necklaces around his neck. He appeared to have very large diamonds on most of his fingers. He waved his hand in my face and referred to the diamonds. He told me over and over again of his wealth and my lack of wealth. He indicated that he would have no problem bailing out of jail if I were to decide to arrest him.
 
 
 211
 At that point I felt the need to again respond to him in some manner. I made other comments to him, quoting from my report I said, "You might be right, but you're the one that sells dope to little black children." He screamed back at me and said, "I sell dope to honkies and white bitches and whores." I said, "You also sell dope to little black children." He replied, "So what if I sell it, you white honkies bring it into the country."
 
 
 212
 We continued to face each other for a few more minutes. The conversation didn't change much.
 
 
 213
 About that time the traffic officer finished his investigation, at least to the point where he determined he would take Mr. Jackson into custody.
 
 
 214
 I left the scene shortly thereafter.
 
 
 215
 Q. Officer McNabb, how long would you say this whole incident took?
 
 
 216
 [McNabb stated that he wrote a report of this incident and of Jackson's words within two or three hours. RT 883. He was finally asked]:
 
 
 217
 Q. Why did you inject those sarcasms or other comments as you told us about?
 
 
 218
 A. I wanted to respond to him in some way. I wanted to respond to what I considered obscene and abusive conduct towards me, conduct that was taking place on a public street within hearing of numerous civilians.
 
 
 219
 Were Officer Butler and Cotton in the area at least during part of this conversation?
 
 
 220
 A. Yes.
 
 
 
 [1]
 The sentences were as follows:
 Appellant Irving Brown was convicted of conspiracy (Count I). He was sentenced to serve a period of three years in addition to the special parole term of three years which we instruct the district court to vacate.
 Appellant Ronald Lewis Crawford was convicted of conspiracy and sentenced to serve six years in addition to a special parole term of three years.
 Appellant Diana Wallace was convicted of conspiracy. Her sentence was suspended and she was placed on five years probation.
 Appellant Kerry Woods was convicted of conspiracy and sentenced to serve a term of seven years and a special parole term.
 Appellant Freddie Harris was convicted of conspiracy and sentenced to serve a period of ten years and a special parole term.
 Appellant Allen Lewis Crutchfield was convicted of conspiracy (Count I); unlawful use of a communication facility, 21 U.S.C. Sec. 843(b) (Count II); and travel to facilitate the conspiracy, 18 U.S.C. Sec. 1952 (Count XI). He was sentenced to twelve years on Count I and a special parole term; to five years each on Counts II and XI, the sentences running concurrently with each other and with the sentence imposed on Count I, for a total of twelve years.
 Appellant Sherman Edward Jackson was convicted of conspiracy (Count I) and of three substantive offenses (Counts XIX-XXI). He was sentenced to fifteen years on the conspiracy count followed by a special parole term; fifteen years on each of Counts XX and XXI, running concurrently with the sentence on Count I; and finally was sentenced to prison for five years on Count XIX, to run consecutively to the other sentences, for a total sentence of twenty years.
 Appellant Bobby Joe Moore was convicted of conspiracy and of six substantive offenses (Counts II, V, XI, XV, XVI and XVIII) charges involving distribution of a controlled substance, use of a communication facility, and travel in interstate commerce to facilitate. After trial and before sentence the court granted Moore's motion for judgment of acquittal as to Counts XV and XVI, sentenced him to fifteen years on the conspiracy charge with a special parole term, and to concurrent terms of five years on each of Counts XI and XVII. On Count V Moore was sentenced to a consecutive term of four years, another special parole term of three years, making his total sentences nineteen years.
 Appellant Conway Waddy was convicted of conspiracy and of four substantive offenses: Count VII (travel in interstate commerce), Counts XV and XVI (use of a communication facility in interstate commerce), and Count XVII (travel in interstate commerce). After trial and before sentence the court granted Waddy's motion for judgment of acquittal as to Counts XV and XVI. He was sentenced to fifteen years on Count I, five years on Count VII, and two years on Count XVII, the latter two terms running consecutively with each other and with the sentence imposed on Count I, for a total of twenty-two years.
 
 
 [2]
 McNabb's testimony is set forth in detail in Appendix B
 
 
 [3]
 On this appeal, the government has sought to reverse its earlier position. It argues:
 The Government's concession during the pretrial suppression hearing (RT September 19-21, 1979, p. 323) does not resolve the custody issue as defendant suggests (Br. Sherman Edward Jackson, p. 9). Custody must exist as a matter of law and the facts in this case do not support such a finding.
 Brief for Plaintiff-Appellee at 164.
 
 
 [4]
 The district judge characterized the exchange as "slander" by Jackson and a response by McNabb "to protect his dignity while maintaining the peace." (RT 529). McNabb was permitted to testify from notes which were created some time later. At another point, the district judge said, "McNabb's words were sarcastic and even heated responses to Jackson's slander, in which [both] speakers finally descended to racial remarks and slurs." (RT 531)
 
 
 [5]
 The procedure adopted by the court provided a prior hearing out of the jury's presence at which objections and motions were considered and ruled upon. This reduced interruptions of the testimony by objections as each witness made his presentation
 
 
 [6]
 That "proper" question was, "you got any dope?"
 
 
 [7]
 The Chief Justice stated:
 The warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant. No distinction can be drawn between statements which are direct confessions and statements which amount to "admissions" of part or all of an offense. The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination. Similarly, for precisely the same reason, no distinction may be drawn between inculpatory statements and statements alleged to be merely "exculpatory." If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution. In fact, statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement.
 Miranda, 384 U.S. at 476-477, 86 S.Ct. at 1628-1629.
 
 
 [8]
 "Serendipity, 1754 [Serendip, former name of Ceylon + ity; formed by Horace Walpole upon the title of the fairy-tale The Three Princes of Serendip, the heroes of which 'were always making discoveries, by accidents and sagacity, of things they were not in quest of.'] The faculty of making happy and unexpected discoveries by accident."
 The Shorter Oxford English Dictionary on Historical Principles, Third Edition, Volume II, Clarendon Press--Oxford. 1980.
 
 
 [9]
 The full statement appears in Reporters Transcript at 4979. Prosecutor Wong argued:
 Mr. Williams' value as a witness was the fact that he was involved at this level of the conspiracy, one of the wholesalers and also the poolers. As I indicated to you, there was every pressure on Mr. Williams to tell the truth, and every pressure upon him not to fabricate.
 I say that because of the plea agreement, M1-76. All the charges in this conspiracy and the other charges in the indictment are dismissed if he tells the truth in this case. The agreement requires that nothing in this agreement will prevent the Government from institution [sic] proceedings against him for perjury, subrogation [sic] of perjury, false statements, false communications or the commission of any such offenses during any of the proceedings referred to herein.
 Should Mr. Williams breach this agreement at any time it will be deemed null and void and both parties may proceed as if it had not existed. There is no reason for him to fabricate and not tell you whatever he believes to be the absolute truth, under the terms of this agreement.
 
 
 [10]
 The same argument was made for Stephens:
 I want to refer you to his plea agreement. It's virtually the same language. Again, we say to you that there is every pressure upon him to tell the absolute truth on the witness stand, every pressure against his lying or fabricating. He loses his plea agreement if he fabricates or perjures himself on the witness stand, he can be prosecuted on these charges, he can be prosecuted in the same way and we also say to you that Stephens' testimony is corroborated over and over and over again by the other evidence in this case. RT at 5006-5007.