**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Lawrence BURSTEN and Solomon Seidel,
Defendants-Appellants.**

**Nos. 76–1711 and 76–1712.**

United States Court of Appeals,
Seventh Circuit.

Argued May 26, 1977.

Decided Aug. 12, 1977.

Rehearing Denied Sept. 15, 1977.

Edward M. Genson, Sam F. Adam, Chicago, Ill., for defendants-appellants.

Richard L. Kieser, U. S. Atty., John S. Leonardo, Asst. U. S. Atty., South Bend, Ind., David H. Coffman, Crim. Div., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before CLARK, Associate Justice,* and CUMMINGS and SPRECHER, Circuit Judges.

PER CURIAM.

In this appeal, defendants Bursten and Seidel contest the sufficiency of the evidence to establish the requisite federal jurisdictional elements of the Travel Act [1] and an evidentiary ruling regarding the willingness of the Government's key witness to submit to a polygraph test. We affirm.

I

Defendants were convicted by a jury under a three count indictment charging one count of conspiracy to defraud the United States and two counts of substantive violation of the Travel Act for their use of a facility in interstate commerce in furtherance of a bribery scheme which violated Indiana law. The proof adduced at trial, according the Government the benefit of all favorable inferences, may be summarized as follows. The Local Housing Authority of East Chicago, Indiana (HAEC) is an agency staffed by officials of the city which was established to facilitate the development of housing for resident low income persons. The housing authority executed this function through either agreeing in advance to purchase a completed housing project or assuming the role of general contractor for such a project itself. Most of the funding for these projects was provided by the Department of Housing and Urban Development (HUD). Although HUD exercised some degree of supervision over the project, the local housing authority retained considerable latitude in the selection of a general contractor.

Benjamin Lesniak, the Government's key witness, served as the Executive Director of HAEC from 1965 to 1973. The duties attendant to this position included researching contract proposals submitted to HAEC, formulating recommendations to the HAEC Board of Directors regarding the selection of a general contractor for specific projects,[2] and conducting various administrative tasks. Lesniak testified pursuant to a grant of immunity embodied in a plea agreement, wherein he pleaded guilty to charges of conspiracy and income tax evasion in connection with his acceptance of bribes on an unrelated project.

Lesniak became involved with defendants during the fall of 1968. At a meeting in the office of the mayor of East Chicago, defendant Bursten and several of his associates, all of whom were Milwaukee businessmen, indicated to Lesniak their desire to build a housing project in that city and their willingness to conform to payoff requests from HAEC and city officials in order to secure a contract. Subsequent to this encounter, the Milwaukee businessmen entered into a partnership for the explicit purpose of planning and constructing the housing project, doing business thereafter as the East Chicago Development Company (ECDC).[3] A final payoff figure of $100,000, to be paid in cash, was negotiated, in return

---

* Associate Justice Tom C. Clark, Retired, of the Supreme Court sat by designation and participated in the conference concerning the disposition of this case. However, his death occurred before this opinion was prepared.

1. 18 U.S.C. § 1952 provides in pertinent part:
   (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—
   (1) distribute the proceeds of any unlawful activity; or
   (2) commit any crime of violence to further any unlawful activity; or
   (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, manage-ment, establishment, or carrying on, of any unlawful activity,
   and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3) shall be fined not more than $10,000 or imprisoned for not more than five years, or both.
   (b) As used in this section "unlawful activity" means . . . (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

2. Lesniak testified that these recommendations were followed by the Board without fail.

3. Defendant Seidel entered the partnership in January 1970. A local office in East Chicago was maintained by ECDC during construction.

for HAEC's cooperation. This compact proved fruitful, in that ECDC was awarded a $7.3 million contract by HUD. It was further agreed that in the event the venture proved more successful than anticipated, ECDC would supplement the emoluments paid to Lesniak.

Ultimately, two additional payments were made to Lesniak by ECDC, and it is these expenditures which form the basis for the criminal charges. Both payments were disguised in the following manner: third parties were persuaded to write checks payable to Lesniak. Defendants, in turn, wrote checks drawn on ECDC's Milwaukee account payable to businesses controlled to some extent by those third parties.

Specifically, the first payment of $20,000 was camouflaged as a "loan" to Euclid Steel, a subcontractor on the project. John Rakoczy, owner of Euclid Steel, was persuaded to "loan" Lesniak $20,000; in turn, ECDC would "loan" Rakoczy an identical sum. On April 16, 1971, in the presence of both defendants, Rakoczy tendered two checks totalling $20,000 to Lesniak in exchange for Lesniak's note. Defendants, as agreed, proffered a $20,000 check drawn on ECDC to Rakoczy, in return for his note.[4] No collateral of any type was involved; this "loan" was never repaid.[5] The Government introduced these documents as evidence at trial. Defendants stipulated to facts indicating that the $20,000 check drawn on ECDC's account at the American City Bank and Trust Company in Milwaukee, and signed by both defendants, was deposited in East Chicago, then sent by bank delivery service through Chicago, Illinois and on to the Milwaukee drawee bank for collection.

Regarding the second payment, defendant Bursten arranged for a loan of $5,000 from the Glendale National Bank in Milwaukee, of which he was a director, to Lesniak's brother, John, who deposited this money in Lesniak's account. To repay this loan, defendants tendered to Lesniak on September 22, 1971 a $6,000 check drawn on ECDC and payable to Mid-States Engineering, a firm in which John Lesniak had an interest. Lesniak passed this check to John, in exchange for three checks drawn on Mid-States Engineering, totalling $5,880.[6] Lesniak subsequently reimbursed his brother, who repaid the bank. Each of these documents was introduced as evidence by the Government at trial. Again, defendants stipulated that the $6,000 check drawn on ECDC and payable to Mid-States Engineering was deposited in Hammond and sent through Chicago to the drawee Milwaukee bank for collection.

Defendants did not dispute the physical evidence at trial, but steadfastly maintained that the transactions denominated as "payoffs" by Lesniak were actually legitimate business loans.[7] Upon conviction, each defendant was sentenced to concurrent prison terms of five years on each count and a fine of $10,000.

II

Defendants urge on appeal that this court's precedential decisions interpreting the Travel Act mandate reversal, since use of the bank check delivery service involved here so minimally affected the execution of the bribery scheme that such utilization cannot be use of "a facility in interstate commerce" within the purview of the Trav-

---

4. At Lesniak's request, the transaction was further disguised. One of the checks to Lesniak and his corresponding note were backdated to April 2 predating the passage of money from ECDC to Rakoczy.

5. Rakoczy testified that Bursten responded to his attempts to settle the matter by instructing him to destroy the note from Lesniak and forget about repaying ECDC.

6. The $120 differential represents an allowance for local tax.

7. The ECDC accountant testified that the total payments of $26,000 were entered on the ECDC books as costs of construction, which would have been treated as deductions for tax purposes in the ordinary course of business. The accountant further stated that he would have disallowed these deductions had he been aware that these amounts inured to the ultimate benefit of a HAEC official.

el Act, citing *United States v. Isaacs,* 493 F.2d 1124 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974); *United States v. McCormick,* 442 F.2d 316 (7th Cir. 1971); and *United States v. Altobella,* 442 F.2d 310 (7th Cir. 1971). *See also Rewis v. United States,* 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971). The Government counters this assertion by contending that our recent decision in *United States v. Peskin,* 527 F.2d 71 (7th Cir. 1975), *cert. denied,* 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 79 (1977), is controlling here. We agree.

*Peskin* involved facts remarkably similar to those of the case at bar. Kaufman & Broad, Inc., (K&B) a home builder, negotiated a purchase of two large parcels of land for residential development in the village of Hoffman Estates, Illinois, the sale being contingent upon K&B obtaining satisfactory rezoning of the property. In order to accomplish this rezoning, K&B distributed $35,000 to various officials of Hoffman Estates, using Peskin, an attorney, as a conduit. Payment was accomplished as follows. An Illinois subsidiary of K&B wrote four checks totalling $100,000 payable to Peskin, this sum to cover his fees for legal services rendered in the transaction, the $35,000 payment to village officials (which was also ostensibly a fee), and any income tax liability incurred by Peskin as a result of the $35,000 bribe being characterized as a fee. Within a day or two of transmittal of each of these checks to Peskin, K&B drew a check on its account in a Detroit Bank payable to the Illinois subsidiary. These checks were first deposited in the subsidiary's Chicago account to replace the funds doled out to Peskin, and then transmitted from bank to bank until ultimately arriving at the drawee bank in Detroit for collection. In response to Peskin's appellate claim that the use of facilities in interstate commerce, i.e., various banks and a Chicago-Detroit carrier system, was so minimal and incidental as to be insufficient to invoke federal criminal jurisdiction under the Travel Act, Judge Fairchild, speaking for the court, averred:

The transmission of funds to Mr. Peskin was essential to the carrying on of the illegal activity. . . . The deposit and interstate clearance of the Detroit checks were essential in fact to the payment of Peskin, although he . . . [was] unaware of the details. We do not consider this use of interstate facilities "minimal" and "incidental" as those terms have been used in this context. 527 F.2d at 77.

■ Here, checks drawn on the ECDC account in a Milwaukee bank were transferred to third parties as the agreed-upon reimbursement for prior payments to Lesniak. These reimbursements, which permitted ECDC to camouflage the actual nature of the transaction and treat the payments as purportedly legitimate tax deductions, were crucial to the success of the bribery scheme. Rakoczy's agreement to "loan" Lesniak $20,000 on behalf of Euclid Steel was obviously contingent upon ECDC's promise to "loan" a corresponding amount to Euclid Steel. Similarly, the machinations of ECDC with respect to Glendale National Bank and Mid-State Engineering were necessary in order to complete the transfer of funds through John Lesniak to his brother, Benjamin. The interstate clearance of these checks, as in *Peskin,* was "essential to the carrying on of the illegal activity," 527 F.2d at 77, and thus constitutes a basis for prosecution under the Travel Act.

■ Defendants make no reference to *Peskin* in either their main brief or reply brief. During oral argument, counsel for defendants advanced the theory that *Peskin* is distinguishable from the instant case in that K&B was a Detroit-based organization operating in Illinois, whereas the base of ECDC's operations was East Chicago, Indiana, where ECDC had established an office. The thrust of this contention is that defendants' transactions manifest no interstate aspects. We note that this assertion is clearly negatived by the record, which demonstrates that the East Chicago office of ECDC was established as a matter of convenience after the inception of the bribery

scheme. If anything, defendants' maintenance of homes and banking accounts in Milwaukee is indicative of the conclusion that Milwaukee, not East Chicago, constituted the base for ECDC's activities.[8] Moreover, the Travel Act plainly requires merely the *use* of a facility in interstate commerce for purposes of furthering an illegal scheme. It is inessential that the scheme itself be interstate in character. *Peskin, supra,* 527 F.2d at 78.

The above cited cases relied upon by defendants, as distinguished by Judge Fairchild in *Peskin, supra,* 527 F.2d at 77, each involved merely incidental and fortuitous use of a facility in interstate commerce, as opposed to the significant utilization of a Milwaukee bank account to effectuate a bribery scheme in Indiana. Accordingly, we find a sufficient basis in this case to warrant the exercise of federal criminal jurisdiction.

### III

Defendants' second contention concerns an evidentiary ruling by the trial court. During the direct examination of Benjamin Lesniak, the Government's key witness, the prosecutor endeavored to introduce into evidence the plea agreement negotiated between Lesniak and the Government, wherein Lesniak agreed to enter a plea of guilty to two counts of an indictment and to testify, under a grant of immunity, on behalf of the Government in exchange for dismissal of the two remaining counts. Defendant Seidel objected to the inclusion of one sentence in the agreement and suggested its excision before the jurors be permitted to view this document. The sentence referred to Lesniak's readiness to submit to a polygraph examination in regard to the matter embodied in the agreement, specifically his promise to fully disclose to the extent of his knowledge, the information regarding defendants to which he testified at trial.[9]

The court initially overruled the prosecutor's objection that this statement was part of Lesniak's agreement with the Government and should not be omitted. The agreement was then read to the jury with the objectionable portion excluded.

During cross-examination of Lesniak, the court *sua sponte* reversed the previous exclusionary ruling, permitting the jurors to view the entire document, but prohibiting the prosecutor from orally publishing it before the jury:

> I am going to let it go in as it is, [the entire document] but it doesn't mean that you need to open up the issue: I am going to let the agreement go in as it is, I am not going to let you read any more from it, but I am not going to excise it.

Lesniak never, in fact, submitted to a polygraph examination. Defendants failed to emphasize this point during the remainder of the cross-examination, although the reversal of the prior exclusionary ruling appears to have been deliberately timed by the trial court to occur during Lesniak's cross-examination, so that further adversarial examination would not be precluded. Tr. at 505. The court rejected defendants' attempt to introduce to the jury evidence to the effect that they would also have been willing to submit to a polygraph examination at some previous time.

Defendants assert on appeal that the trial court's egregious error in permitting evidence of Lesniak's purported willingness to undergo a polygraph examination to be considered by the jurors is compounded by the court's rebuff of defendants' efforts to produce similar evidence on their own behalf, and by the court's alleged foreclosure of cross-examination of Lesniak on the subject.

The Government defends admission of this evidence by asserting that the included paragraph was offered not to bolster the credibility of Lesniak's trial testimony, but

---

**8.** In addition, defendants were referred to by attorneys for both prosecution and defense as the "Milwaukee people" throughout the trial proceedings.

**9.** The sentence read:

> Benjamin Lesniak, Jr., also agrees to take a polygraph test by the Government operator, in regard to any of the above-stated disclosures.

"to counter the inevitable, strenuous defense argument that Lesniak lied to the Government about Defendants-Appellants' criminal activity for the purpose of obtaining the benefits set forth in that same plea agreement." Government's Brief at 16. Thus, the prosecution's rationalization is that this sort of evidence is probative for purposes of demonstrating that Lesniak was bound in his pretrial disclosures regarding defendants' activities by the knowledge that he was subject to a lie detector test at any time.

■ Contrary to defendants' declarations, this circuit has not adopted an inflexible dogma regarding the admissibility of the results of polygraph examinations. The position of this court has been, and remains, that the question of the admissibility of such results is a matter within the sound discretion of the trial judge. *United States v. Infelice,* 506 F.2d 1358, 1365 (7th Cir. 1974); *United States v. Penick,* 496 F.2d 1105, 1109 (7th Cir. 1974); *United States v. Chastain,* 435 F.2d 668, 687 (7th Cir. 1970). Rather, the consistent rejection by federal courts of the results obtained through the use of such "truth-determining" devices stems from a multiplicity of factors. Among these are the distrust of the accuracy of results based upon a nexus between autonomic discharge and veracity, this skepticism being fueled by disagreement among experts in the field. Also, judges loathe the spector of trial by machine, wherein each man's sworn testimony may be put to the electronic test. Finally, there exists the apprehension that jurors will abdicate their responsibility for determining credibility, and rely instead upon the assessment of a machine.

■ However, this case involves not polygraph examination results, but a prosecution attempt to buttress the believability of its key witness. Despite the Government's attempt to nicely distinguish trial from pretrial credibility of a witness' statements, the sole purpose for pursuing admission of the disputed sentence could only have been

to strengthen Lesniak's story in the jury's estimation. If the Government was permitted to show that Lesniak had been intimidated into truthfulness prior to trial by the ever-present possibility of a polygraph examination, then the inescapable inference is that his same story at trial is also true. Counsel for the Government stated during oral argument that the inclusion of similar paragraphs regarding potential polygraph examination in plea agreements is a routine practice. Given the awesome powers which the prosecution may wield in order to insure the veracity of its witnesses' statements, we strongly condemn this superfluous practice. Prosecutors who introduce such evidence in the future to obtain convictions should expect reversal.

■ However, in the context of this case, we do not find the admission of the sentence referring to Lesniak's willingness to take a lie detector test to be error of the magnitude requiring reversal. The trial court cautiously protected against the possibility that the contested sentence would unduly affect the jurors' assessment of Lesniak's credibility by refusing to permit it to be read aloud and curtailing all discussion by counsel in the presence of the jury. Lesniak testified at great length and was subjected to thorough and vigorous cross-examination. We cannot find that after this protracted opportunity for observation of Lesniak and evaluation of his testimony, the jurors' possible perusal of one sentence so infected their deliberation that reversal is required. Under these circumstances, the error is harmless.

■ We find no error in the trial court's refusal to permit defendants to state that they would have been willing to submit to a pretrial polygraph examination. Such evidence is so unreliable and self-serving as to be devoid of probative value. Moreover, the record indicates that defendants were not foreclosed by the trial judge from cross-examining Lesniak as to whether he did take a lie detector test. If defendants

chose to avoid this topic as a matter of trial strategy, we see no grounds for reversal.

## IV

Defendants press two additional arguments on appeal. First, defendants claim error in the failure of the trial court to dismiss the indictment for reasons of prejudicial delay. The indictment charges conspiratorial conduct from December 15, 1969 through December 31, 1972, although no overt act more recent than September 22, 1971 is charged. The indictment was returned on January 23, 1976. In the interim, one Joseph Futowsky, defendants' bookkeeper and an unindicted co-conspirator, died. Defendants argue that because the Government's delay deprived them of Futowsky's purportedly favorable testimony, dismissal was required.

■ We note that since the indictment was returned within the statutory limitation period, five years, dismissal of the indictment on due process grounds is mandated only where it is demonstrated at trial that "preindictment delay caused substantial prejudice to the defendant's rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." *United States v. Kopel*, 552 F.2d 1265, 1276 (7th Cir. 1977). *See also United States v. Marion*, 404 U.S. 307, 320, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971).

■ The record in this case evidences no indication that the delay was intentionally devised by the prosecutor to gain a strategic edge. On the contrary, the Government completed its investigation and secured Lesniak's agreement to testify only in August 1975. In view of the labyrinthian schemes and arrangements for payment involved here, we do not find the delay inordinate. Moreover, we are aware of no rule which requires an automatic finding of prejudice to the defense whenever a witness dies, particularly when the content of that witness' testimony is unknown. *Cf. United States v. Key*, 458 F.2d 1189 (10th Cir.), *cert. denied*, 408 U.S. 927, 92 S.Ct. 2510, 33 L.Ed.2d 339 (1972). We conclude that defendants' due process claim is without merit.

Finally, defendants attack the system of random assignment of cases prevalent in the Northern District of Indiana, claiming that the prosecutor is thereby enabled to select his own forum and his own judge, and request that this case be remanded for a hearing on this question. An interlineal reading of defendants' argument in this regard demonstrates their view that their chances for receiving a more lenient sentence would be enhanced had they been sentenced in the South Bend Division, as opposed to the Hammond Division.

■ Obviously, defendants can claim no right to be sentenced by a particular judge. Here, the trial court complied with all the requirements of Rule 18 of the Federal Rules of Criminal Procedure, in that the trial was held within the district wherein the crime occurred, at a site selected as a result of defendants' pretrial request for a change of venue on account of prejudicial publicity.

The district judge considered defendants' motion for random reassignment, and denied it after affording defendants the opportunity for a hearing on April 8, 1976. In the absence of any perceivable prejudice to defendants' defense, we discern no justification for disturbing this ruling.

Accordingly, for the reasons detailed herein, defendants' convictions are

AFFIRMED.