**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Michael MUNIZ, Defendant–Appellant.**

**No. 03CA0268.**

Colorado Court of Appeals, Div. V.

Feb. 21, 2008.

As Modified on Denial of Rehearing April 3, 2008.

Certiorari Denied Aug. 18, 2008.

John W. Suthers, Attorney General, Jennifer A. Berman, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Douglas K. Wilson, Colorado State Public Defender, Alan Kratz, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge J. JONES.

Defendant, Michael Muniz, appeals the judgment of conviction entered on jury verdicts finding him guilty of one count of second degree murder and two counts of a crime of violence. We reverse and remand for a new trial.

## I.  Background

On July 2, 1996, K.B. (the victim) returned home after visiting a Target store. Shortly thereafter, her neighbors, a husband and wife and their three daughters, heard yelling and screaming coming from across the street. On their way to investigate the screams, the neighbors observed a man running from the area of the screams to his "boxy" gray or black car, which two of them later identified as a Chevrolet Celebrity. The neighbors went into the victim's open garage and found her suffering from stab wounds that proved fatal.

The police collected fingerprints and hair from the scene, as well as blood from underneath one of the victim's fingernails. The coroner determined that the victim died from the stab wound in her upper right chest, which was made by a knife with a blade at least four and one-half inches long.

The wife gave police a description of the man she had seen running away from the area. She described him as white, about six feet one inch or six feet two inches tall, weighing approximately 180 pounds, with medium length dark hair, bangs, and a mustache. He had no tattoos, and was between thirty-five and forty years old. Her husband described the man as white with a dark complexion, about six feet tall, weighing about 170 pounds, with no tattoos, and in his late twenties. The oldest daughter (age sixteen) described the man as Asian or Hispan-

ic, about six feet tall, weighing about 185 pounds, with dark hair, and in his mid-thirties. She did not notice any tattoos. The two younger daughters described the man as Hispanic, about six feet tall, with no noticeable tattoos. All the witnesses said the man they saw leaving the scene was wearing a white T-shirt and blue jeans.

Based on the wife's description and report, the police created a composite drawing of the suspect, which she rated as an eight or nine out of ten in terms of accuracy. The police investigated numerous leads developed as a result of the composite drawing and other information, and investigated numerous suspects. Defendant was not identified as a suspect, and none of the leads led the police to file charges against anyone.

On July 15, 2001, over five years after the murder, the police received a telephone call from an unidentified person, who stated:

Oh. Hey, I have an unsolved murder for you.... Well, this happened about five years ago.... July 2nd, 1996.... Okay, I killed, I stabbed some lady, okay? ... Yes, on 46th and Independence.... Yes, I followed her from Target store, from Lakeside Mall.... I followed her over there, and I just killed, you know, I stabbed her.... I just want to let you know that, that I'm on the loose again. So if you don't believe me, look at my record.... Just let you know, I'm back.

All the information the caller provided regarding the crime had been published in newspaper articles shortly after the murder.

The police traced the telephone call to defendant's motel room, where he was staying with his wife and daughter. After the police arrived at his motel room, he voluntarily accompanied an officer to the station for questioning, during which he denied making the phone call to the police or having owned a gray, four-door car or any other car.

Subsequently, defendant's wife, sister, and mother identified the voice of the anonymous caller as belonging to defendant. Defendant voluntarily returned to the police station three days after the initial questioning and admitted that he owned a green 1984 Buick at the time of the murder. The police ob-

tained vehicle registration records showing that defendant owned a 1984 Chevrolet Celebrity at the time of the murder, and that he sold it a few months later. Defendant voluntarily spoke to various detectives on several subsequent occasions.

Defendant is a Hispanic male, and is five feet seven inches tall. He weighs 170 pounds and has noticeable tattoos on his hand, wrist, bicep, face, and neck, all of which pre-date the murder. The fingerprints, hair, and blood taken from the crime scene did not match his fingerprints, hair, or DNA.

When a police officer showed three of the witnesses (the wife and two of her daughters) a photographic array including defendant, none of them identified defendant as the person they saw leaving the vicinity of the murder. Several months later, the wife, husband, and one of their daughters viewed a physical line-up, which included defendant. Again, none of the witnesses identified defendant as the man they had seen running from the vicinity of the murder, though the daughter stated defendant (whom she previously had seen in the photographic line-up) most closely resembled the man she had seen on the day of the murder.

The People charged defendant with one count of first degree murder and two counts of a crime of violence. The People subsequently reduced the first degree murder charge to a charge of second degree murder.

Defendant's first trial ended in a mistrial because the jury was unable to reach a unanimous verdict. Defendant was retried in November 2002, and the jury found him guilty of second degree murder and the two violent crime charges. The court sentenced him to forty-eight years in the custody of the Department of Corrections.

## II. Double Jeopardy

■ Defendant contends that the district court's declaration of a mistrial in his first trial did not result from manifest necessity, and retrying him violated his federal and state constitutional rights to be free from double jeopardy. We disagree.

■ "The double jeopardy clauses of the United States and Colorado Constitutions

provide that no person shall be twice put in jeopardy for the same offense." *Ortiz v. Dist. Court,* 626 P.2d 642, 645 (Colo.1981); *see* U.S. Const. amends. V & XIV; Colo. Const. art. II, § 18. However, when a criminal trial is properly terminated by a declaration of a mistrial based on manifest necessity, double jeopardy does not bar retrial of the accused. *Ortiz,* 626 P.2d at 646; *People v. Rivers,* 70 P.3d 531, 534–35 (Colo.App.2002) (citing *People v. Schwartz,* 678 P.2d 1000 (Colo.1984)).

■■■ Manifest necessity exists "if the jury is deadlocked and cannot reach a verdict." *Schwartz,* 678 P.2d at 1011. In determining whether the jury cannot reach a verdict, a court should consider the following factors: "(1) the jury's collective opinion that it cannot agree; (2) the length of the trial; (3) the complexity of the issues; (4) the length of time the jury has deliberated; (5) whether the defendant has made timely objections to a mistrial; and (6) the effects of exhaustion or coercion on the jury." *Id.*

■■ A district court has broad discretion in deciding whether to declare a mistrial, and we will not disturb its decision absent a gross abuse of that discretion and prejudice to the defendant. *Id.; People v. Mersman,* 148 P.3d 199, 203 (Colo.App.2006).

Here, the jurors deliberated over two days for approximately thirteen hours and sent three separate notes to the court indicating that they were split and could not reach a decision. After the second note, the court issued a modified *Allen* instruction, *see Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), to the jurors encouraging them to consult with each other and deliberate with a view toward reaching a verdict. The jurors remained divided, however, stating in their third note: "None of us believe further deliberations will convince us to change our opinion. We are firmly entrenched in our beliefs and are still split." Given the jurors' collective opinion regarding their inability to reach a verdict and the length of time they deliberated, we discern no abuse of the district court's discretion. *See Rivers,* 70 P.3d at 535.

### III. Exclusion of Evidence of Alternate Suspects

Defendant next contends the district court erred in granting the prosecution's motion in limine to preclude him from presenting evidence that two other individuals, E.F. and K.H., could have killed the victim. We disagree as to K.H., but because we agree with defendant that the district court erred in precluding him from offering evidence that E.F. could have committed the murder, we reverse defendant's convictions and remand for a new trial.

### A. Proceedings on the Prosecution's Motion in Limine

The prosecution's motion in limine to preclude evidence of alternate suspects pertained to numerous persons, including E.F. and K.H., whom the police had investigated in connection with the murder but determined not to be "viable suspects." The prosecution argued that evidence of these alternate suspects was not admissible because there was no evidence that any of them had any "direct connection" with the murder. In response, defendant filed a notice of his intent to offer evidence of eleven alternate suspects (including E.F. and K.H.), two of whom were not identified in the prosecution's motion.

Following a hearing, the district court granted the prosecution's motion. The court concluded that as to all the alternate suspects at issue, either there was no showing of a direct connection with the murder in this case or there was no showing that any particular prior offense committed by any of the alternate suspects was committed in such a distinctive manner as to indicate that the suspect committed the murder in this case. With respect to E.F. specifically, the court ruled that the manner in which he killed another individual in 1986 was not so similar to the manner in which the victim in this case was killed to indicate that he murdered the victim in this case. The court did not make any specific findings with respect to K.H.

### B. Governing Law Regarding Evidence of Alternate Suspects

■ A defendant has a constitutional right to present a complete defense. *Holmes v.*

*South Carolina*, 547 U.S. 319, 324, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006); *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986). Consistent with this right, a defendant may present evidence that another person might have committed the charged offense. *See Holmes*, 547 U.S. at 324, 326–27, 126 S.Ct. 1727; *People v. Flowers*, 644 P.2d 916, 918 (Colo.1982); *People v. Owens*, 97 P.3d 227, 235 (Colo.App.2004) ("A defendant may introduce evidence implicating another person in the crime charged.").

■ However, this right is subject to and limited by well-established rules of evidence prohibiting the introduction of irrelevant evidence or relevant evidence where "its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes*, 547 U.S. at 326–27, 126 S.Ct. 1727; *see also Crane*, 476 U.S. at 689–90, 106 S.Ct. 2142. Thus, evidence of alternate suspects may be excluded for such reasons if it only creates an unsupported inference or a possible ground for suspicion. *People v. Perez*, 972 P.2d 1072, 1074 (Colo.App.1998); *People in Interest of R.L.*, 660 P.2d 26, 28 (Colo.App. 1983).

■ In *People v. Mulligan*, 193 Colo. 509, 568 P.2d 449 (1977), the defendant unsuccessfully sought to introduce evidence that other individuals had motives to commit the offense with which he was charged. The supreme court held that evidence of another person's motive or opportunity to commit an offense " 'is not admissible without proof that such other person committed some act directly connecting him with the crime.' " *Id.* at 518, 568 P.2d at 456 (quoting *State v. Umfrees*, 433 S.W.2d 284, 287 (Mo.1968)); *accord Schwartz*, 678 P.2d at 1008–09; *Owens*, 97 P.3d at 235; *Perez*, 972 P.2d at 1074 (also noting that "[t]his rule is premised on the need to place reasonable limits on collateral testimony and to avoid encouraging the jury to speculate"). When the asserted direct connection is the alternate suspect's commission of a similar crime, the evidence of the alternate suspect's motive or opportunity is admissible only if "[t]he details of the two crimes [are] distinctive enough to represent a

'signature' of a single individual." *Perez*, 972 P.2d at 1074–75.

In *People v. Bueno*, 626 P.2d 1167 (Colo. App.1981), the defendant was charged with robbing a service station. He sought to introduce evidence that the day after the robbery a grocery store in the same vicinity was robbed, but a witness to that robbery did not identify him as the perpetrator. The district court excluded the evidence, ruling that there was no evidence directly connecting the robber of the grocery store with the service station robbery. A division of this court reversed, holding that where there is an issue as to the identity of the perpetrator, and the defendant desires to present alternate suspect evidence that bears on that issue, rather than merely showing motive or opportunity, evidence directly connecting the alternate suspect to the crime with which the defendant is charged is not required to render admissible evidence that an alternate suspect committed a similar offense. The test of admissibility in that context is "one of relevancy," and is determined by assessing whether "all of the similar facts and circumstances, taken together, support a finding that the same person was probably involved in both transactions . . . ." *Id.* at 1170–71; *see also Flowers*, 644 P.2d at 918–20 (adopting the *Bueno* test for admissibility of similar offense evidence relating to identity).

In *People in Interest of R.L.*, the defendant was charged with arson arising out of a fire in a run-down, largely vacant apartment building. A witness testified that he saw a truck leaving the scene at high speed with its lights off. The truck was registered to the former owner of the building, who retained a security interest in the building. The district court refused to permit the defendant to call the former owner as a witness to question him about his financial records, the disposition of insurance proceeds recovered as a result of the fire, and a fire in the another building he owned near the apartment building. *People in Interest of R.L.*, 660 P.2d at 28. A division of this court reversed, concluding that the evidence was relevant, not merely to the issues of motive and opportunity, but to the issue of identity. *Id.*

In this case, as in both *Bueno* and *People in Interest of R.L.*, defendant sought to present evidence of alternate suspects pertaining to the issue of identity, not merely motive or opportunity. He did not seek to introduce only evidence of prior offenses to link the alternate suspects to the victim's murder, such as in *Bueno*, but also sought to introduce other evidence circumstantially and inferentially connecting them with the crime, such as in *People in Interest of R.L.*

■ Under these circumstances, the relevance of the evidence should be determined by considering the totality of the circumstances. If a reasonable fact finder could find that the facts pertaining to the purported alternate suspect create a reasonable doubt as to the identity of the perpetrator, the evidence should be admitted. The "direct connection" test is not applicable where, as here, the contested issue is identity, not merely motive or opportunity. And the "signature" test is not applicable because a prior offense is not the only evidence allegedly linking the alternate suspect to the crime with which defendant was charged. Evidence directly connecting an alternate suspect to the crime and evidence of substantial similarities between a prior offense and the crime may, of course, be highly relevant to the determination of the admissibility of alternate suspect evidence in this context, but it is not necessary in all circumstances to render evidence of an alternate suspect admissible.

### C. Standard of Review

■ We review a district court's decision excluding alternate suspect evidence for an abuse of discretion. *People v. Arrington*, 843 P.2d 62, 66 (Colo.App.1992); *People v. Pack*, 797 P.2d 774, 777 (Colo.App.1990); *People v. Armstrong*, 704 P.2d 877, 879 (Colo.App. 1985). A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, *see People v. Ibarra*, 849 P.2d 33, 38 (Colo.1993), or based on an erroneous understanding or application of the law, *see People v. Garcia*, 169 P.3d 223, 228 (Colo. App.2007).

### D. Application to E.F.

■ The district court appears to have precluded evidence pertaining to E.F. solely because of dissimilarities between his prior offense (a 1986 homicide) and the murder at issue here. That analysis was too narrow. Considering all the relevant circumstances, we conclude the evidence pertaining to E.F. was sufficiently relevant to the issue of the perpetrator's identity to render it admissible. According to individuals to whom the police spoke in the course of investigating the crime, as well as documents obtained in the course of that investigation, these circumstances include the following:

- E.F. matched the physical description of the man whom witnesses described as having fled the scene of the crime. E.F. was a white male, was five feet eleven inches tall, weighed 185 pounds, and had brown hair, brown eyes, and facial hair.

- E.F.'s employer saw the police drawing of the suspect in a newspaper, thought the sketch resembled E.F., and reported his belief to the police.

- One of the investigating officers thought E.F. strongly resembled the person shown in the drawing.

- One witness identified E.F. as resembling the person she saw leaving the scene of the crime.

- E.F. frequented the Target store where the victim reportedly had been on the day she was murdered.

- E.F. told his girlfriend he had had an argument with someone at the Target store around the date of the murder.

- On at least one occasion shortly before the day of the murder, E.F. had been seen driving a car resembling the one identified as the suspect's vehicle.

- When police showed E.F. a picture of the victim, he said she looked familiar, though he was not sure why.

- E.F. had significant mental health problems, for which he took medication. According to his girlfriend, he had not been taking his medication on the days before the murder, which caused him to have a very bad temper.

- Ten years earlier, E.F. had lost his temper and killed a man by stabbing him in the chest with a large knife.
- The victim in this case was stabbed in the chest with a large knife.
- E.F. routinely carried a large knife.
- E.F. was not at work on the day of the murder, had no corroborated or otherwise verifiable alibi, and did not return to work until several days after the murder.

■ The circumstances here are analogous to those in *People in Interest of R.L.* because there was identification evidence placing E.F. at the scene and his own statements to investigators connected him to the victim. That evidence did not establish that E.F. was the perpetrator, and there was other evidence perhaps diminishing the impact of some of that evidence (such as the fact that, as with defendant, the DNA evidence collected at the scene did not match E.F. Nevertheless, we conclude that when all of the evidence pertaining to E.F. is considered, it was sufficient to permit a reasonable juror to have a reasonable doubt as to the identity of the perpetrator because it tended to make defendant's identity as the perpetrator less probable. *See* CRE 401. Furthermore, we do not perceive that its relevance was substantially outweighed by other considerations such as unfair prejudice, confusion of the issues, or potential to mislead the jury. *See* CRE 403.

Accordingly, we conclude the district court abused its discretion in granting the prosecution's motion in limine as to E.F.

■ Defendant contends the error here was of constitutional dimension, and therefore his convictions must be reversed because the error was not harmless beyond a reasonable doubt. We agree that the harmless beyond a reasonable doubt standard applies because the alternate suspect evidence was directly relevant to an essential element of the crime charged and favorable to defendant's defense. *See People v. Melendez,* 102 P.3d 315, 322 (Colo.2004); *People v. Garcia,* 179 P.3d 250, 258 (Colo.App. 2007); *see also Holmes,* 547 U.S. at 324, 126 S.Ct. 1727 (analyzing the right to introduce alternate suspect evidence as an aspect of a defen-

dant's constitutional right to present a complete defense); *United States v. Valenzuela–Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982) (a defendant's Sixth Amendment right to compulsory process is violated if he is arbitrarily deprived of testimony that would have been material and favorable to his defense). Under this standard, we must reverse the conviction if there is a reasonable probability that the defendant could have been prejudiced by the error. *Dunlap v. People,* 173 P.3d 1054, 1091 (Colo. 2007); *Blecha v. People,* 962 P.2d 931, 942 (Colo.1998).

The People do not argue that any error here was harmless, much less harmless beyond a reasonable doubt. The evidence against defendant was far from overwhelming. The People's case relied heavily on the telephone confession, which defendant disputed, and his ownership of a car resembling the one seen by witnesses at the time of the offense. No physical evidence connected defendant with the crime, and the identification evidence was relatively weak. The first trial against defendant, which involved substantially the same evidence as was admitted in the second trial, ended in a mistrial when the jury was unable to render a unanimous verdict. Accordingly, we conclude there is a reasonable probability that the exclusion of evidence as to E.F. prejudiced defendant. Therefore, we must reverse defendant's convictions. We further conclude that even if the test for nonconstitutional harmless error applies—whether the error substantially influenced the verdict or affected the fairness of the trial proceedings, *Salcedo v. People,* 999 P.2d 833, 841 (Colo.2000)—reversal of defendant's convictions would be required.

### E.   Application to K.H.

■ K.H. resembled the police drawing, generally matched the physical description of the man seen leaving the scene, owned a gray vehicle that resembled the one observed by witnesses on the date of the murder, and had a prior conviction involving the use of a knife. However, no witnesses said he resembled the man who fled from the scene; he was much heavier than the man described by witnesses; there was no evidence he carried

(or even owned) a large knife; there was no evidence he had possibly encountered the victim before she was murdered; there was no evidence he had seen the victim before; and the crime of which he had been previously convicted involved menacing with a knife rather than stabbing with a knife. K.H. became a suspect only because of his prior menacing conviction, of which one of the investigating officers was aware.

Because the evidence only raised a bare suspicion of his involvement in the victim's murder, we conclude the district court did not abuse its discretion in excluding evidence pertaining to K.H.

### IV. Other Issues

Because they are unlikely to recur on remand, we do not address defendant's contentions that the district court erred in permitting a witness to identify him as the perpetrator at trial and in denying his challenge for cause of a prospective juror.

However, we address two of the remaining issues raised by defendant because they concern matters likely to impact a retrial.

### A. Denial of Defendant's Motion to Suppress

■ Defendant contends the district court erred by denying his motion to suppress certain statements he made after he allegedly invoked his right to remain silent during the interrogation on July 15, 2001. We disagree.

Throughout the questioning, the detective represented to defendant that he would be able to go home at the end of the questioning. Defendant repeated that he wanted "to be cooperative" and that he was "not going nowhere." Shortly after the detective played the tape of the telephone call, he advised defendant of his *Miranda* rights.

About one hour later, defendant stated to the detective:

Well, this … let's do this. To end this interview, give me my blood test, and let me go, or … or … or whatever you're going to do. I'm not going to sit here and argue with you. I know you want to argue with me…. Let's say, I'm not going to

… you're not going to tell me what I want to know, and I'm not going to tell you…. Oh, I just want to go home. That's what I want. I want to know can you take my blood test, or whatever you want to do, or … or …

The detective responded, "Sit tight, and I'll go make the arrangements," and then left defendant to arrange for the test. About two hours later, before a blood sample was taken from defendant, the detective resumed questioning defendant. During that questioning, the detective asked defendant whether he ever owned a gray, four-door car. Defendant denied having ever owned such a car or any other car.

Before defendant's second trial, he moved to suppress statements he made to the detective on July 15, 2001 after he asked to have the blood test done, arguing that at that point he had invoked his right to remain silent. The district court denied the motion, finding that the "lengthy conversation in wanting to end the interview" did not show that defendant had "stopped agreeing to talk on a voluntary basis," and that defendant had not invoked his right to remain silent.

■ When reviewing a district court's suppression ruling, we defer to the court's findings of fact but review its conclusions of law de novo. *People v. Allen*, — P.3d —, —, 2007 WL 2874428 (Colo.App. No. 05CA1038, Oct. 4, 2007). The facts here are undisputed, and so the resolution of the issue turns on the application of the law to those facts.

■ When exercising his right to remain silent,

a suspect must clearly articulate the desire to remain silent so that a reasonable police officer in the circumstances would understand the suspect's words and conduct to mean that the suspect is asserting [his] *Miranda* right to cut off questioning, thereby requiring the police to respect fully the suspect's exercise of this right.

*People v. Arroya*, 988 P.2d 1124, 1129–30 (Colo.1999). If a suspect makes an ambiguous or equivocal statement, police officers need not attempt to clarify the statement or

ascertain the suspect's intent to invoke his right to remain silent, and are free to continue the questioning. *Id.* at 1131; *People v. Gray,* 975 P.2d 1124, 1130 (Colo.App.1997). In determining whether a suspect has clearly articulated his right to remain silent, a court should assess the context of the suspect's words under the totality of the circumstances, giving consideration to a number of factors, including

> the words spoken by the defendant and the interrogating officer, the officer's response to the suspect's words, the speech patterns of the suspect, the content of the interrogation, the demeanor and tone of the interrogating officer, the suspect's behavior during questioning, the point at which the suspect invoked the right to remain silent, and who was present during the interrogation.

*Arroya,* 988 P.2d at 1132.

We conclude that a reasonable police officer could have understood the statements at issue as an expression of defendant's desire to go home promptly, rather than as an invocation of his right to remain silent. Accordingly, the district court did not abuse its discretion in denying defendant's motion to suppress.

### B. Exclusion of Evidence That Defendant Offered to Take a Polygraph Examination

■ Defendant next contends the district court erred in granting the People's motion to exclude evidence that he offered to take a polygraph examination. He argues the evidence was relevant to show his "consciousness of innocence," and therefore prohibiting him from introducing that evidence denied him his constitutional right to present evidence in his own defense. *See Taylor v. Illinois,* 484 U.S. 400, 408–09, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988); *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). In the alternative, he argues the evidence was admissible under the "rule of completeness" to place in context other statements he made to one of the investigating officers. We are not persuaded by either argument.

#### 1. Relevance

At the preliminary hearing, defendant's counsel asked one of the investigating officers if defendant had offered to take a "lie detector test" during an interview. The officer responded that defendant had made such an offer. Further examination revealed, however, that defendant had said during the interview that he had asked his sister and his mother whether he should take a polygraph examination. Nonetheless, we conclude defendant offered to take a polygraph examination because that is apparently how the officer construed defendant's statements.

The People moved to exclude evidence of this offer. After hearing argument on the matter, the district court granted the motion, reasoning that whatever probative value the evidence had was substantially outweighed by the danger of confusing the issues and misleading the jury, and therefore that the evidence should be excluded under CRE 403.

■ We review a district court's ruling concerning the relevance of evidence or its prejudicial effect for an abuse of discretion. *People v. Harris,* 43 P.3d 221, 225 (Colo. 2002); *People v. Ortiz,* 155 P.3d 532, 534 (Colo.App.2006). To constitute an abuse of discretion, the district court's evidentiary ruling must be shown to have been manifestly arbitrary, unreasonable, or unfair. *Ortiz,* 155 P.3d at 534.

Defendant concedes that the results of a polygraph examination are per se inadmissible in Colorado because the results are of questionable reliability and admitting evidence of such results seriously interferes with and unduly prejudices a jury's evaluation of the demeanor and credibility of the witnesses. *See People v. Anderson,* 637 P.2d 354, 356–62 (Colo.1981), *abrogated on other grounds by People v. Shreck,* 22 P.3d 68 (Colo.2001); *People v. Wallace,* 97 P.3d 262, 267–68 (Colo.App.2004). He nevertheless contends that an offer to take a polygraph examination should be admissible because it is commonly understood that law enforcement authorities consider such tests reliable and therefore guilty defendants are unlikely to volunteer to take such a test. We are not persuaded.

In *People v. Lambert,* 194 Colo. 421, 422–23, 572 P.2d 839, 840 (1978), the supreme court held that a defendant's offer to take a polygraph examination was properly excluded. Defendant contends *Lambert* is distinguishable because the court decided that case on the basis the testimony was "self-serving" hearsay, and subsequent changes to the rules of evidence render such self-serving hearsay admissible. It is not at all clear, however, that the *Lambert* court relied on rules regarding hearsay. The court stated that such evidence was "self-serving and had no special indicia of truthfulness," terminology that has been used in the hearsay context, *id.* at 423, 572 P.2d at 840, but the court did not cite any evidentiary rule or refer expressly to the concept of hearsay. The court also stated that "[t]he statement, under the circumstances, lacked probative value," language which indicates the court ruled based on the evidence's lack of relevance. *Id.*

■■■ We need not decide, however, whether *Lambert* definitively forecloses defendant's challenge to the exclusion of the evidence because we conclude as a matter of law that evidence of a defendant's offer or willingness to take a polygraph examination is irrelevant to show consciousness of innocence.

Most courts that have considered this question have held that evidence of a defendant's or a witness's offer or willingness to take a polygraph examination is per se inadmissible to, in the case of a defendant, show consciousness of innocence, or, in the case of a witness, bolster credibility. *United States v. Vigliatura,* 878 F.2d 1346, 1349 (11th Cir. 1989) (evidence of a witness's or a defendant's willingness to take test inadmissible); *United States v. Bursten,* 560 F.2d 779, 785 (7th Cir.1977) (evidence of a witness's willingness to take test inadmissible); *State v. Britson,* 130 Ariz. 380, 636 P.2d 628, 632 (1981) (evidence of the defendant's willingness to take test inadmissible); *Rollins v. State,* 362 Ark. 279, 208 S.W.3d 215, 216–17 (2005) (evidence of a witness's or a defendant's willingness to take test inadmissible); *People v. Hinton,* 37 Cal.4th 839, 38 Cal.Rptr.3d 149, 126 P.3d 981, 1019–20 (evidence of the defendant's willingness to take test inadmissible),

*cert. denied,* —— U.S. ——, 127 S.Ct. 581, 166 L.Ed.2d 434 (2006); *People v. Thornton,* 11 Cal.3d 738, 114 Cal.Rptr. 467, 523 P.2d 267, 284 (1974) (evidence of the defendant's willingness to take test inadmissible), *overruled on other grounds by People v. Flannel,* 25 Cal.3d 668, 160 Cal.Rptr. 84, 603 P.2d 1 (1979), *and abrogated on other grounds by People v. Martinez,* 20 Cal.4th 225, 83 Cal. Rptr.2d 533, 973 P.2d 512 (1999); *People v. Carter,* 48 Cal.2d 737, 312 P.2d 665, 674 (1957) (evidence of a witness's or a defendant's willingness to take test inadmissible); *Moore v. State,* 267 Ind. 270, 369 N.E.2d 628, 630 (1977) (evidence of the defendant's willingness to take test inadmissible); *State v. Webber,* 260 Kan. 263, 918 P.2d 609, 619–20 (1996) (evidence of the defendant's willingness to take test inadmissible); *Penn v. Commonwealth,* 417 S.W.2d 258, 258 (Ky. 1967) (evidence of the defendant's willingness to take test inadmissible); *State v. Mower,* 314 A.2d 840, 841 (Me.1974) (evidence of the defendant's willingness to take test inadmissible); *Kosmas v. State,* 316 Md. 587, 560 A.2d 1137, 1140 (1989) (evidence of a defendant's willingness or unwillingness to take test inadmissible); *State v. Riley,* 568 N.W.2d 518, 526–27 (Minn.1997) (evidence of the defendant's willingness to take test inadmissible); *State v. Bibee,* 496 S.W.2d 305, 316 (Mo.Ct.App.1973) (evidence of the defendant's willingness to take test inadmissible); *State v. LaRocca,* 81 N.J.Super. 40, 194 A.2d 578, 581–82 (App.Div.1963) (evidence of the defendant's willingness to take test inadmissible); *State v. Hegel,* 9 Ohio App.2d 12, 222 N.E.2d 666, 668 (1964) (evidence of the defendant's willingness or unwillingness to take test inadmissible); *Hall v. State,* 570 P.2d 955, 960 (Okla.Crim.App.1977) (evidence one of two defendants was willing to take test inadmissible), *overruled on other grounds by Neal v. State,* 837 P.2d 919 (Okla.Crim.App. 1992); *Commonwealth v. Saunders,* 386 Pa. 149, 125 A.2d 442, 445–46 (1956) (evidence of the defendant's willingness to take test inadmissible); *State v. Britt,* 237 S.C. 293, 117 S.E.2d 379, 384 (1960) (evidence of the defendant's willingness to take test inadmissible), *overruled on other grounds by State v. Torrence,* 305 S.C. 45, 406 S.E.2d 315 (1991); *State v. Damron,* 151 S.W.3d 510, 515–16

(Tenn.2004) (evidence of a defendant's willingness to take test inadmissible); *State v. Rowe*, 77 Wash.2d 955, 468 P.2d 1000, 1003 (1970) (evidence of the defendant's willingness to take test inadmissible); *see also State v. Antonio A.*, 90 Conn.App. 286, 878 A.2d 358, 364–65 (2005) (slight probative value of evidence the defendant offered to take a polygraph test was outweighed by potential for jury confusion).

The reasoning of these courts was clearly articulated by Justice Traynor in *Carter*:

Lie detector tests do not as yet have enough reliability to justify the admission of expert testimony based on their results.... It therefore follows that a suspect's willingness or unwillingness to take such a test is likewise without enough probative value to justify its admission. The suspect may refuse to take the test, not because he fears that it will reveal consciousness of guilt, but because it may record as a lie what is in fact the truth. A guilty suspect, on the other hand, may be willing to hazard the test in the hope that it will erroneously record innocence, knowing that even if it does not the results cannot be used as evidence against him.

*Carter*, 312 P.2d at 674 (citations omitted); *see also State v. Mottram*, 158 Me. 325, 184 A.2d 225, 228 (1962) (a fact finder cannot assess a suspect's offer to take such a test "without assuming a non-existent value for lie detector tests in general"); *Saunders*, 125 A.2d at 445–46; *Rowe*, 468 P.2d at 1003 ("[A] defendant has everything to gain and nothing to lose by making the offer, so the conduct underlying the so-called inference of innocence can well be feigned, artificial and wholly unreliable.").

A few courts have indicated that evidence of a defendant's offer to take a polygraph examination may be admissible if the defendant, before taking the test, stipulated to the admissibility at trial of the tests results and a test was in fact conducted. *United States v. Harris*, 9 F.3d 493, 502 (6th Cir.1993) (absent such a stipulation, the offer is only marginally relevant because the defendant does "not have the requisite 'adverse interest at stake to cloak his willingness with credibility'" (quoting *Wolfel v. Holbrook*, 823 F.2d 970,

974 (6th Cir.1987))); *Durham v. State*, 240 Ga. 203, 240 S.E.2d 14, 15 (1977); *see also City of Bismarck v. Berger*, 465 N.W.2d 480, 481 (N.D.Ct.App.1991). *See generally* Joseph T. Bockrath, Annotation, *Admissibility of Lie Detector Test Taken upon Stipulation that the Result Will Be Admissible in Evidence*, 53 A.L.R.3d 1005 (1973). These courts, however, assume the enforceability of such stipulations, contrary to the law in this state. *Anderson*, 637 P.2d at 361–62 (polygraph results are inadmissible at trial even if the parties have stipulated to admissibility); *People v. Orr*, 39 Colo.App. 289, 294, 566 P.2d 1361, 1365 (1977) (court is not bound by stipulation to the admissibility of polygraph results; results are unreliable and therefore inadmissible notwithstanding stipulation).

The Wisconsin appellate courts have gone farther, holding that evidence of a defendant's offer to take a polygraph test is admissible if there is evidence the defendant believed at the time he made the offer that the test is "possible, accurate, and admissible." *State v. Shomberg*, 288 Wis.2d 1, 709 N.W.2d 370, 384 (2006); *accord State v. Pfaff*, 269 Wis.2d 786, 676 N.W.2d 562, 568 (2004). They reason that under such circumstances the offer is evidence of consciousness of innocence. *See Pfaff*, 676 N.W.2d at 569; *State v. Santana–Lopez*, 237 Wis.2d 332, 613 N.W.2d 918, 921 (App.2000).

We are persuaded by the reasoning of the vast majority of courts that have addressed this question. Because the test results are inadmissible, a suspect's offer to take a test is a self-serving act without any risk, and therefore is not genuinely probative of the suspect's consciousness of innocence. *See Bursten*, 560 F.2d at 785; *Carter*, 312 P.2d at 674; *Saunders*, 125 A.2d at 445–46; *Rowe*, 468 P.2d at 1003.

Moreover, admitting such evidence would create a substantial danger of confusing the issues and misleading the jury. A fact finder's assessment of a suspect's offer to take a polygraph test would require consideration of the suspect's subjective state of mind; subjective beliefs of particular law enforcement officers as to the value of such a test under the circumstances; evidence of the behavior and beliefs of hypothetical "reasonable" sus-

pects and officers in the circumstances of the case (to test the expressed subjective beliefs of testifying defendants and officers); and, if a test were not conducted, hypothetical scenarios concerning what officers would have done with the test results in the event the defendant "passed" or "failed" the test. Attempting to untangle this veritable Gordian knot would be an exercise in conjecture.

Accordingly, we conclude evidence of a defendant's offer or willingness to take a polygraph examination is per se inadmissible as evidence of consciousness of innocence.

We reject defendant's argument that the courts that have held that offers to take a polygraph test are inadmissible have erroneously assumed suspects know the test results are inadmissible. That assumption is a reasonable one in light of the long-standing nature of the rule in Colorado that such results are inadmissible and the fact that the rule is widely followed in other jurisdictions.

Nor are we persuaded by defendant's contention that even if an innocent suspect believes polygraph examination results are inadmissible, the suspect is much more likely to consent to such a test than a guilty suspect because he will also assume police are likely to believe his assertions of innocence if he passes the test. We refuse to speculate as to what weight, if any, police are likely to give to the results of a polygraph examination in any given case.

Defendant chiefly relies on the Wisconsin cases. We have rejected the rationale of those cases, however. In any event, under the circumstances here, they do not support defendant's position. As noted, in Wisconsin, a defendant's offer to take a polygraph test is admissible only if the defendant presents evidence that he believed the test "is possible, accurate, and admissible." *Shomberg*, 709 N.W.2d at 384. Here, defendant presented no such evidence, and therefore evidence of his offer to take the test would have been inadmissible even under the Wisconsin rule. *See id.*

## 2. Rule of Completeness

We likewise reject defendant's reliance on the "rule of completeness." That rule pro-vides that where admitting one part of a statement would be unfair or misleading, the adverse party may introduce other parts of the statement which ought in fairness to be considered along with it. *See* CRE 106; *People v. Melillo*, 25 P.3d 769, 775 & n. 4 (Colo.2001). However, the rule "is subject to the same considerations of relevancy and potential prejudice as other evidence." *Melillo*, 25 P.3d at 775–76. Thus, a court "may properly exclude part of a statement if it is irrelevant or prejudicial, while allowing admission of another part of the same statement." *Id.* at 776.

Applying these principles, courts in other jurisdictions have held that the rule of completeness does not render admissible evidence of a defendant's willingness to take a polygraph examination that is otherwise inadmissible because of its lack of probative value. *See, e.g., Britson*, 636 P.2d at 632; *Rollins*, 208 S.W.3d at 216–17; *State v. Burnham*, 427 A.2d 969, 971–72 (Me.1981); *State v. Edwards*, 23 Wash.App. 893, 600 P.2d 566, 568 (1979). *But see State ex rel. Kemper v. Vincent*, 191 S.W.3d 45, 49 (Mo. 2006) (offer admissible under rule of completeness where discussion of taking test was instrumental in causing the defendant to confess).

We are not persuaded by defendant's contention that evidence of his offer to take the test was necessary to give the jury a complete and accurate account of the interrogation. *See State v. Watling*, 211 S.W.3d 202, 207 (Mo.Ct.App.2007) (offer not admissible under rule of completeness where the discussion of the test did not cause the defendant to confess; evidence of offer not necessary to give the jury a complete picture of any contested evidence). Moreover, we have concluded that the evidence is not relevant. Hence, the rule of completeness did not dictate that the court admit the evidence.

In summary, we conclude the district court did not abuse its discretion in granting the People's motion to exclude evidence of defendant's offer to take a polygraph examination. That evidence is inadmissible as a matter of law under the circumstances of the case. Accordingly, in the event the case is retried

on remand, such evidence shall not be admitted.

The judgment of conviction is reversed, and the case is remanded for a new trial.

Judge ROY and Judge GRAHAM concur.